# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00460-CV

**Creedmoor-Maha Water Supply Corporation, Appellant**

**v.**

**Texas Commission on Environmental Quality and Jona Acquisition, Inc., Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. D-1-GN-08-004388, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING**

## O P I N I O N

The Creedmoor-Maha Water Supply Corporation (Creedmoor) appeals a district court judgment dismissing, for want of subject-matter jurisdiction, claims for declaratory and injunctive relief through which it seeks to challenge a final order of the Texas Commission on Environmental Quality (TCEQ). In a single issue, Creedmoor asserts that the district court erred in dismissing its claims. We disagree and will affirm the district court's judgment.

## BACKGROUND

Appellant Creedmoor is a non-profit, member-owned water supply corporation (WSC) that provides water utility service to retail customers. The right or ability to sell water or sewer service to the public is regulated by the State, and WSCs are generally required to obtain a certificate of convenience and necessity (CCN) from TCEQ as a prerequisite for providing retail water or sewer service to the public. *See* Tex. Water Code Ann. § 13.242(a) (West 2008).

With this right, which is typically granted exclusively as to a designated geographic area, comes a corresponding duty to "serve every consumer within its certified area and . . . render continuous and adequate service within the area or areas." *Id.* § 13.250(a) (West 2008); *see also id.* §§ 13.250(b)-(e), .2501 (West 2008) (limitations on utility's ability to refuse service). In 1975, Creedmoor obtained a CCN from TCEQ's predecessor granting it the right and duty to provide water service to customers located in a several-thousand-acre area encompassing portions of Caldwell County, Hays County, Bastrop County, and southeastern Travis County.

The record reflects that Creedmoor currently serves approximately 2,344 existing connections. For the water it sells to customers, Creedmoor relies primarily on wells in the Barton Springs-Edwards Aquifer, although it also purchases water wholesale from the City of Austin and another supplier. Creedmoor's aggregate total maximum daily capacity of all supplies is 2,380 gallons per minute (g.p.m.).

The legislature has delegated to TCEQ the authority to revoke or amend CCNs under certain circumstances. Section 13.254 of the water code authorizes TCEQ, on petition or sua sponte, to revoke or amend a CCN either with the holder's written consent or without such consent where (1) "the certificate holder has never provided, is no longer providing, is incapable of providing, or has failed to provide continuous and adequate service in the area, or part of the area, covered by the certificate;" (2) in certain counties "the cost of providing service by the certificate holder is so prohibitively expensive as to constitute denial of service;" (3) "the certificate holder has agreed in writing to allow another retail public utility to provide service within [the holder's CCN's] service area;" or (4) the holder has acquiesced in another retail public utility's provision of services in the holder's CCN's service area by failing to file a cease-and-desist action within a specified time. *See*

2

*id.* § 13.254(a) (West 2008). These revocation proceedings are governed by the Administrative Procedures Act (APA), and parties aggrieved by the TCEQ's orders may seek judicial review. *Id.* § 13.003 (West 2008) ("Chapter 2001, Government Code applies to all proceedings under this chapter except to the extent inconsistent with this chapter."); *see also id.* § 5.351(a) (West 2008) ("A person affected by a ruling, order, decision, or other act of the commission may file a petition to review, set aside, modify, or suspend the act of the commission.").

In 2005, the legislature created an alternative means by which areas within a CCN can be modified or revoked. An "owner of a tract of land that is at least 50 acres and that is not in a platted subdivision actually receiving water or sewer service" may petition TCEQ for "expedited release" of the area from a CCN "so that the area may receive service from another retail public utility." Act of May 29, 2005, 79th Leg., R.S., ch. 1145, § 9, sec. 13.254(a-1), 2005 Tex. Gen. Laws 3771, 3775, *codified at* Tex. Water Code Ann. § 13.254(a-1). The petitioner has the burden of demonstrating that:

> (1)     a written request for service, other than a request for standard residential or commercial service, has been submitted to the certificate holder, identifying:
>
> (A)     the area for which service is sought;
>
> (B)     the timeframe within which service is needed for current and projected service demands in the area;
>
> (C)     the level and manner of service needed for current and projected service demands in the area; and
>
> (D)     any additional information requested by the certificate holder that is reasonably related to determination of the capacity or cost for providing the service;

3

(2)     the certificate holder has been allowed at least 90 calendar days to review and respond to the written request and the information it contains;

(3)     the certificate holder:

     (A)     has refused to provide the service;

     (B)     is not capable of providing the service on a continuous and adequate basis within the timeframe, at the level, or in the manner reasonably needed or requested by current and projected service demands in the area; or

     (C)     conditions the provision of service on the payment of costs not properly allocable directly to the petitioner's service request, as determined by the commission; and

(4)     the alternate retail public utility from which the petitioner will be requesting service is capable of providing continuous and adequate service within the timeframe, at the level, and in the manner reasonably needed or requested by current and projected service demands in the area.

Tex. Water Code Ann. § 13.254(a-1) (West 2008). The petitioner is required to deliver a copy of the petition to the CCN holder, "who may submit information to the commission to controvert information submitted by the petitioner." *Id.* Once TCEQ determines that a petition is administratively complete, it "shall," within 90 days, "grant the petition" unless it makes an express finding that the petitioner failed to satisfy the elements listed above and "supports its finding with separate findings and conclusions for each element based solely on the information provided by the petitioner and the certificate holder." *Id.* § 13.254(a-3) (West 2008). TCEQ may grant or deny a petition subject to terms and conditions specifically related to the petitioner's service request and all relevant information submitted by the petitioner and CCN holder. *Id.*

In contrast to the revocation proceedings under subsection (a), the legislature exempted from the APA the TCEQ's proceedings on petitions for expedited release. *See id.*

4

§ 13.254(a-4) (West 2008). It also made the TCEQ's decision on the petition "final after any reconsideration authorized by the commission's rules" and mandated that it "may not be appealed." *Id.*

If an area covered by a CCN is "decertified" under either subsection (a)'s revocation proceedings or subsections (a-1) through (a-4)'s expedited release procedures, another retail public utility may not render service to the public in that area "without providing compensation for any property that the commission determines is rendered useless or valueless to the decertified retail public utility as a result of the decertification." *See id.* § 13.254(d) (West 2008). The legislature has prescribed procedures for determining the amount of compensation required. *See id.* § 13.254(e)-(g-1) (West 2008). Factors in determining valuation include "the amount of the retail public utility's debt allocable for service to the area in question," "the impact of future revenues lost from existing customers," and "other relevant factors." *Id.* § 13.254(g).

Appellee Jona Acquisition, Inc., now known as Carma Easton, Inc. ("Carma"), is seeking to develop a master-planned community—including residential, multi-family, restaurant, and retail land uses—on approximately 1,960 acres in Travis County near the intersection of U.S. 183 and F.M. 1625, a few miles south of the Austin-Bergstrom International Airport. A significant portion of Carma's planned development is located within the area encompassed by Creedmoor's 1975 CCN. In May 2008, Carma filed with TCEQ a petition for expedited release of the area from Creedmoor's CCN. Carma alleged and presented proof that it had requested Creedmoor to provide service for 10,300 living-unit equivalents (a measure of water flow or usage) with projected peak water demand over 13,000 gallons per minute (g.p.m.), that Creedmoor had been given the required 90 days to review and respond to the request, that Creedmoor had refused to provide the service or

5

was unable to do so because of inadequate infrastructure or water supplies (although the evidence also reflected that Creedmoor professed to be "still pursuing our search" for suitable supplies), and that the alternative retail public utility from which Carma desired to obtain service—the City of Austin—was capable of providing Carma the service it needed. *See id.* § 13.254(a-1). Creedmoor filed a response to Carma's petition. *See id.* On August 8, 2008, after considering Carma's petition and Creedmoor's response, TCEQ's executive director signed an order granting the petition and releasing the area at issue from Creedmoor's CCN. Creedmoor filed a motion with the TCEQ commissioners to overturn the executive director's order, which was overruled by operation of law on November 4, 2008.

On December 5, 2008, Creedmoor filed suit against appellees seeking declarations under the Uniform Declaratory Judgments Act[1] that the TCEQ order was invalid and also seeking injunctive relief enjoining the order's enforcement, affirmatively recertifying the disputed area to Creedmoor's CCN, and enjoining Carma from seeking water service from another utility until released by Creedmoor.[2] Both TCEQ and Carma answered and filed pleas to the jurisdiction.[3] Following a hearing at which Creedmoor and TCEQ presented evidence, the district court granted the pleas, dismissed Creedmoor's suit, and signed a "final and appealable" judgment. This appeal ensued.

---

[1] *See* Uniform Declaratory Judgments Act (UDJA), Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001–.011 (West 2008).

[2] *See id.* §§ 37.003, .004, .011. Creedmoor also sought attorney's fees under the UDJA. *See id.* § 37.009.

[3] Carma also asserted counterclaims for declaratory and injunctive relief that are not at issue on appeal.

6

**ANALYSIS**

In a single issue, Creedmoor urges that the district court erred in granting appellees' pleas to the jurisdiction because "Creedmoor pled sufficient jurisdictional facts in its petition," "sovereign immunity is either waived or not implicated," "Creedmoor has standing to bring its claims," and "Creedmoor's claims are not time-barred."

**Standard and scope of review**

A plea to the jurisdiction challenges a trial court's authority to decide a case. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004). Analysis of whether this authority exists begins with the plaintiff's live pleadings. *Id.* at 226. The plaintiff has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). Whether the plaintiff met this burden is a question of law that we review de novo. *Id.* We construe the pleadings liberally, taking them as true, and look to the pleader's intent. *Id.*; *Texas Logos, L.P. v. Brinkmeyer*, 254 S.W.3d 644, 659 (Tex. App.—Austin 2008, no pet.). If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiffs should be afforded the opportunity to amend. *Miranda*, 133 S.W.3d at 226-27. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. *Id.* at 227.

When resolving issues presented by the plea to the jurisdiction, we may consider evidence that the parties have submitted and must do so when necessary to resolve the jurisdictional

7

issues. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). In fact, in a plea to the jurisdiction, a party may present evidence to negate the existence of a jurisdictional fact alleged in the pleadings, which we would otherwise presume to be true. *See Miranda*, 133 S.W.3d at 227. To the extent the challenge implicates the merits of the plaintiff's cause of action, the party asserting the plea has the burden of negating a genuine issue of material fact as to the jurisdictional fact's existence, in a manner similar to a traditional summary-judgment motion. *See id.* at 227-28. Whether the party meets this burden is a question of law that we review de novo. *Id.* at 228. If the pleading requirement has been met and the party challenging jurisdiction submits evidence that implicates the merits of the pleader's cause of action, we take as true all evidence favorable to the pleader and indulge every reasonable inference and resolve any doubts in the pleader's favor. *Id.*[4]

Appellees have asserted that Creedmoor's suit is barred by sovereign immunity. Creedmoor insists that its claims do not implicate sovereign immunity because they seek "prospective" declaratory and injunctive relief to restrain "ultra vires" or "unconstitutional" acts by TCEQ, and do not seek "retrospective monetary relief." *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 368-69 (Tex. 2009) ("[W]hile governmental immunity generally bars suits for retrospective monetary relief, it does not preclude prospective injunctive remedies in official capacity suits against governmental actors who violate statutory or constitutional provisions."). Similarly, Creedmoor urges that it seeks declarations as to the construction and validity of water code

---

[4] A somewhat different standard applies when a challenge to a jurisdictional fact's existence does not implicate the merits. *See University of Tex. v. Poindexter*, ___ S.W.3d ___, No. 03-04-00806CV, 2009 WL 1896071, at *3 (Tex. App.—Austin July 3, 2009, no pet.).

subsections 13.254(a-1) through (a-4)—something the UDJA generally authorizes[5]—and that its allegations against TCEQ present a justiciable controversy regarding the scope and validity of the agency's statutory authority. *See Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002) ("Private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority. But such suits are not 'suits against the State.' This is because suits to compel state officers to act within their official capacity do not attempt to subject the State to liability. Therefore, certain declaratory-judgment actions against state officials do not implicate the sovereign-immunity doctrine.") (citations omitted); *Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 404 (Tex. 1997) ("[A]n action to determine or protect a private party's rights against a state official who has acted without legal or statutory authority is not a suit against the State that sovereign immunity bars."). Alternatively, Creedmoor argues that the UDJA waives sovereign immunity as to its claims. *See Heinrich*, 284 S.W.3d at 373 n.6 (stating that the UDJA "contemplates that governmental entities may be—indeed, must be—joined in suits to construe their legislative pronouncements" and that such a requirement impliedly waives sovereign immunity (quoting *Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994) (citing Tex. Civ. Prac. & Rem. Code Ann. § 37.006(b); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 697-698 (Tex. 2003))). Even if we accept them as accurate, Creedmoor's contentions do not resolve whether its claims implicate sovereign immunity.

---

[5] *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) ("A person . . . whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.").

Regardless whether the remedies Creedmoor seeks are properly characterized as "prospective" or "retrospective" in nature, they would have the effect of invalidating the TCEQ order. Creedmoor seeks injunctive relief restraining the order's enforcement, recertifying the disputed area to Creedmoor's CCN, and prohibiting Carma from acquiring water service from anyone other than Creedmoor until Creedmoor agrees to release the area. Creedmoor also requests declarations that water code subsections 13.254(a-1) through (a-4) and the implementing rules "are unconstitutional and the TCEQ's Approval Order is thereby invalid and vacated" and that "TCEQ exceeded its statutory authority in issuing the TCEQ Approval Order[;] thereby said Order is hereby invalid and vacated." Generally, a suit challenging a specific administrative order implicates sovereign immunity because it seeks to control state action—it seeks to restrain the State or its officials in the exercise of discretionary statutory or constitutional authority. *See Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 198 (Tex. 2004); *Southwest Airlines Co. v. Texas High-Speed Rail Auth.*, 867 S.W.2d 154, 157 (Tex. App.—Austin 1993, writ denied) (op. on reh'g); *see also Heinrich*, 284 S.W.3d at 372-73 & n.6 (ultra vires suit—the converse of a suit to control state action—"must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act"). Sovereign immunity bars such a suit unless the legislature has waived immunity, *see Mega Child Care, Inc.*, 145 S.W.3d at 198 (acknowledging that statutory right to judicial review of administrative decisions waives sovereign immunity against such suits), or the claimant affirmatively alleges facts demonstrating that the agency's action is unconstitutional or ultra vires of the agency's statutory authority. *See Texas Highway Comm'n v. Texas Ass'n of Steel Importers*, 372 S.W.2d 525, 530 (Tex. 1963);

10

*Southwestern Bell Tel. Co. v. Public Util. Comm'n*, 735 S.W.2d 663, 668 (Tex. App.—Austin 1987, no writ).[6]  The latter type of claims are said to invoke the trial court's "inherent jurisdiction" to protect against agency action that is unconstitutional or ultra vires of the agency's statutory authority. *See Southwestern Bell*, 735 S.W.2d at 667-68.

Creedmoor does not avoid these jurisdictional limitations merely because it pleads claims under the UDJA.  The UDJA is not a general waiver of sovereign immunity; it "does not enlarge a trial court's jurisdiction, and a litigant's request for declaratory relief does not alter a suit's underlying nature." *Heinrich*, 284 S.W.3d at 370; *see State v. BP Am. Prod. Co.*, 290 S.W.3d 345, 360 (Tex. App.—Austin 2009, pet. filed).  One implication of this limitation is that an otherwise proper UDJA claim seeking to construe or invalidate a statute is nonetheless barred by sovereign immunity if the remedy would have the effect of establishing a right to relief against the State that implicates sovereign immunity and for which immunity has not been waived. *See City of Houston v. Williams*, 216 S.W.3d 827, 828-29 (Tex. 2007) (per curiam) ("'[P]rivate parties cannot circumvent the State's sovereign immunity from suit by characterizing a suit for money damages, such as a contract dispute, as a declaratory-judgment claim.'" (quoting *IT-Davy*, 74 S.W.3d at 856); "[I]f the sole purpose of such a declaration [regarding a governmental body's statutory authority] is to obtain a money judgment, immunity is not waived."); *see also BP Am. Prod.*, 290 S.W.3d at 360-61; *Koch v. Texas Gen. Land Office*, 273 S.W.3d 451, 455 (Tex. App.—Austin 2008, pet. filed).

---

[6] *See also Continental Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 397 (Tex. 2000) ("It is well recognized under Texas law that there is no right to judicial review of an administrative order unless a statute provides a right or unless the order adversely affects a vested property right or otherwise violates a constitutional right.") (citing *Stone v. Texas Liquor Control Bd.*, 417 S.W.2d 385, 385-86 (Tex. 1967)).

This principle extends to UDJA actions that seek declaratory or injunctive relief against agency orders from which the legislature has not granted a right of judicial review and thereby waived sovereign immunity. *See KEM Tex., Ltd. v. Texas Dep't of Transp.*, No. 03-08-00468-CV, 2009 Tex. App. LEXIS 4894, at *8-18 (Tex. App.—Austin 2009, no pet.) (applying these principles in another suit attempting to challenge non-appealable agency order through UDJA). Thus, regardless of the fact that Creedmoor invoked the UDJA, sovereign immunity barred the district court from granting the relief it requested—effectively invalidating the TCEQ order—unless Creedmoor properly invoked the court's inherent jurisdiction by alleging unconstitutional or ultra vires action. *See Southwestern Bell*, 735 S.W.2d at 668; *see also KEM Tex., Ltd.*, 2009 Tex. App. LEXIS 4894, at *8-12. And the fact that Creedmoor does not seek monetary relief, as Creedmoor emphasizes, is not dispositive because its claims would equally implicate sovereign immunity if the effect of the remedy sought was to control state action. *See Heinrich*, 284 S.W.3d at 370-72; *KEM Tex., Ltd.*, 2009 Tex. App. LEXIS 4894, at *8-12 (rejecting argument that UDJA plaintiff's claims purporting to seek to "determine or protect its rights" and not retrospective monetary relief automatically meant that the claims avoided sovereign immunity).

Similarly, the fact that a claimant purports to allege "ultra vires" or "unconstitutional" conduct by a state official does not alone mean that it has avoided sovereign immunity and invoked a trial court's inherent jurisdiction. To assert a valid ultra vires claim, the plaintiff "must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Heinrich*, 284 S.W.3d at 372. Conversely, if the plaintiff alleges only facts demonstrating acts within the officer's legal authority and discretion, the claim seeks to control state action, and

12

is barred by sovereign immunity. *See id.*; *McLane Co. v. Strayhorn*, 148 S.W.3d 644, 650-51 (Tex. App.—Austin 2004, pet. denied). In the same way, if the claimant is attempting to restrain a state officer's conduct on the grounds that it is unconstitutional, it must allege facts that actually constitute a constitutional violation. *See Dewhurst v. Hendee*, 253 S.W.3d 320, 334-39 (Tex. App.—Austin 2008, pet. struck) (*Hendee II)*.

Creedmoor asserts that it invoked the district court's inherent jurisdiction by alleging both ultra vires conduct by TCEQ and that water code subsections 13.254(a-1) through (a-4) and its implementing rules are unconstitutional as TCEQ applied them. In support, it quotes portions of its live petition that consist chiefly of legal conclusions.[7] Creedmoor, however, has the initial burden

---

[7] In addition to quoting its prayer for declaratory and injunctive relief, previously discussed, Creedmoor identifies the following portions of its pleading as invoking the district court's inherent jurisdiction:

> [T]his Court has Jurisdiction over Plaintiff's Declaratory Judgment Action because the Executive Director, Staff, and Commission of the TCEQ exceeded their statutory authority when they issued the TCEQ Approval Order granting [Carma's] Petition to decertify a portion of Creedmoor's CCN when: (1) [Carma] did not own all the property that it sought to be decertified from Creedmoor's CCN and the TCEQ knew that [Carma] did not own the property; (2) [Carma] did not make a complete and valid non-standard water utility service application to Creedmoor for the Property; the TCEQ knew that Creedmoor had outstanding indebtedness to the U.S. Department of Agriculture; and (4) Creedmoor did not refuse to provide service and was capable of providing adequate water service to [Carma].

And:

> Petitioner is seeking an order from this Court that the Texas State Statute Texas Water Code § 13.254[(a-1) through (a-4)] and the related TCEQ rule found at 30 TAC Section 291.113(b), (d) and (c) is unconstitutional because it: (a) conflicts with the Federal Statute found at 7 USC § 1926(b) and thereby violates the Supremacy Clause found in Article VI, Clause 2 of the US Constitution; (b) violates that "Open Courts" provisions of Texas Constitution art. I. § 13 because it denied Creedmoor the ability to appeal the TCEQ Approval Order granting [Carma's]

of alleging *facts* that affirmatively demonstrate the district court's jurisdiction. *See Miranda*, 133 S.W.3d at 226. Likewise, the fact that Creedmoor characterized the TCEQ order in its pleadings as a "constitutional violation" or as "exceeding statutory authority" does not control our jurisdictional determination. Rather, we construe the statutory or constitutional provisions that are implicated, apply them to the facts Creedmoor has pled and that were not negated by evidence, and determine whether Creedmoor has alleged acts that would constitute violations of the relevant constitutional provisions or exceed TCEQ's authority under the relevant statutory provisions. *See Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n*, 600 S.W.2d 264, 265-70 (Tex. 1980); *Hendee v. Dewhurst*, 228 S.W.3d 354, 368-69 (Tex. App.—Austin 2007, pet. denied) (*Hendee I*); *see also KEM Tex. Ltd.*, 2009 Tex. LEXIS 4894, at *8-20.[8]

---

Petition decertifying a portion of Creedmoor's CCN thereby depriving Creedmoor of its due process of law when its goods and reputation have been injured; and, (c) violates Petitioner's rights of due process.

[8] In its reply brief, Creedmoor argues that whether its factual allegations actually stated legally cognizable violations of the statutes and constitutional provisions at issue "is not the subject of this appeal as it goes to the merits of Creedmoor's underlying claims." Creedmoor is mistaken in its view of our standard of review. As we explained in *Hendee I*:

To the extent that Plaintiffs suggest that it is categorically improper to adjudicate, through a jurisdictional plea, jurisdictional issues that implicate or overlap the merits, that notion is belied by *Miranda*. *See* [*Texas Dep't of Parks & Wildlife v.*] *Miranda*, 133 S.W.3d 217,] 227-28 [(Tex. 2004)] (regarding whether parks and wildlife department acted with gross negligence so as to waive sovereign immunity under the recreational use statute). It is also well-established that where a trial court's jurisdiction depends upon whether a state official's acts are within her constitutional or statutory authority, such as when a plaintiff alleges ultra vires action to avoid sovereign immunity, the trial court may sometimes be able to decide the jurisdictional issue as a matter of law based on the pleadings by construing the constitutional and statutory provisions defining the actor's authority and ascertaining whether the acts alleged would exceed that authority. *See, e.g.*, *McLane Co. v. Strayhorn*, 148 S.W.3d 644, 649 (Tex. App.—Austin 2004, pet. denied) (acknowledging that in determining whether declaratory judgment suit may

14

**"Ultra vires" claims**

In its live pleading, Creedmoor alleged that TCEQ "exceeded its statutory authority" when it granted Carma's petition and issued its order because (1) Carma "failed to meet the requirements of TWC § 13.254(a-1) and 13.2502 when it made its non-standard water utility service applications to Creedmoor;" (2) Carma "did not own all the land it sought to decertify;" (3) "TCEQ knew that [Carma] had outstanding indebtedness to the U.S. Department of Agriculture"; and (4) "Creedmoor was willing and able to supply [Carma] with sufficient water." We have previously detailed the authority the legislature has delegated to TCEQ to decide petitions for expedited release of an area from a CCN. *See* Tex. Water Code Ann. § 13.254(a-1)-(a-4). In short, the legislature has delegated to TCEQ the exclusive authority to decide expedited release petitions as prescribed in the statute, exempted TCEQ from the APA's requirements when deciding such petitions, and explicitly made TCEQ's decision final and unappealable. *See id.*

---

be maintained against a state official, it was first necessary, in light of sovereign immunity principles, to construe statutes defining official's powers to "decide whether the [official] validly exercised her discretion or acted outside of her legal authority"); *cf. Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n*, 600 S.W.2d 264, 265-70 (Tex. 1980) (construing constitution to determine whether plaintiff alleged ultra vires action by state officials; state had raised issue via special exceptions). And *Miranda* would further allow jurisdictional challenges, via its summary judgment-like process, to the existence of the alleged acts that are asserted to have been beyond the actor's constitutional or statutory authority.

*Hendee v. Dewhurst*, 228 S.W.3d 354, 368-69 (Tex. App.—Austin 2007, pet. denied) (*Hendee I*). While genuine disputes over the existence of facts material to jurisdiction will preclude dismissal, *see Miranda*, 133 S.W.3d at 227-28, the pure legal question of whether pled and un-negated facts would establish a constitutional violation or ultra vires conduct can—and must—be resolved to determine the trial court's jurisdiction, and this is true regardless of whether that issue parallels the merits. *Hendee I*, 228 S.W.3d at 368-69; *see also Miranda*, 133 S.W.3d at 227 (emphasizing that jurisdictional issues should be resolved "as soon as practicable").

Three of Creedmoor's factual allegations of "ultra vires" conduct plainly complain of the merits of the decision TCEQ made on Carma's petition. Creedmoor challenges whether Carma met its burden of showing that (1) it had requested service from Creedmoor in compliance with water code subsection 13.254(a-1)(1)-(2); (2) it was "the owner of a tract of land that is at least 50 acres and that is not in a platted subdivision actually receiving water or sewer service," *see id.* § 13.254(a-1); or (3) Creedmoor "has refused to provide the service" or was not capable of doing so. *See id.* § 13.254(a-1)(3). These are allegations that TCEQ reached an incorrect or wrong result when exercising its delegated authority, not facts that would demonstrate TCEQ exceeded that authority. *See North Alamo Water Supply Corp. v. Texas Dep't of Health*, 839 S.W.2d 455, 459 (Tex. App.—Austin 1992, writ denied) ("The fact that the [agency] might decide 'wrongly' in the eyes of an opposing party does not vitiate the agency's jurisdiction to make [the] decision."); *see also KEM Tex., Ltd.*, 2009 Tex. App. LEXIS 4894, at *17-18. The fourth allegation—"TCEQ knew that [Carma] had outstanding indebtedness to the U.S. Department of Agriculture"—does not implicate any provision in water code subsections 13.254(a-1) through (a-4) and does not state any acts by TCEQ beyond its statutory authority (although, as we discuss below, it does relate to one of Creedmoor's constitutional theories). In short, none of these allegations invoked the district court's inherent jurisdiction to remedy ultra vires agency actions.[9]

---

[9] For this reason, we need not address whether Creedmoor's ostensible ultra vires claims are also barred by the rule that ultra vires claims must be brought against individual state officers in their official capacity, not the State or its agencies, *see Heinrich*, 284 S.W.3d at 372–73, or whether the UDJA would have any implications in regard to this rule under the circumstances here. *See id.* at 373 n.6 (observing that Heinrich was "not challenging the validity of the bylaws or the governing statute, but rather petitioners' actions under them"); *see also id.* at 370 n.3 (also noting that parties had not disputed proper construction of statute at issue).

16

**Supremacy Clause & 7 U.S.C. § 1926(b)**

As for its constitutional theories for invoking jurisdiction, Creedmoor primarily emphasizes its allegations that TCEQ's application of water code subsections 13.254(a-1) through (a-4) and its implementing rules, 30 Tex. Admin. Code § 291.113 (2009), violated the Supremacy Clause of the U.S. Constitution[10] by violating a federal statute, 7 U.S.C.A. § 1926(b) (West 1999). Simply described, 7 U.S.C.A. § 1926 establishes a loan program through the U.S. Department of Agriculture to aid designated associations, including water supply corporations, in developing and operating water distribution and sewer-service facilities in rural areas, which are secured by the association's assets. *See* 7 U.S.C.A. § 1926(a) (West 1999 & Supp. 2009). Subsection (b) of section 1926 imposes federal restrictions on competition and customer choice in areas served by indebted associations:

> The service provided or made available through any [indebted water] association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of said loan . . . .

*Id.* § 1926(b). The U.S. Fifth Circuit Court of Appeals has stated that section 1926(b) "'indicates a congressional mandate that local governments not encroach upon the services provided by [federally indebted water] associations, be that encroachment in the form of competing franchises,

---

[10] *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

new or additional permit requirements, or similar means,'" *see North Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910, 915 (5th Cir. 1996) (per curiam) (quoting *City of Madison v. Bear Creek Water Ass'n, Inc.*, 816 F.2d 1057, 1060-61 (5th Cir. 1987)), and advances two policy purposes: "(1) to encourage rural water development by expanding the number of potential users of such systems, thereby decreasing the per-user cost, and (2) to safeguard the viability and financial security of such associations (and [the] loans) by protecting them from the expansion of nearby cities and towns." *Id.* The Fifth Circuit has further termed "the service area of a federally indebted water association" as "sacrosanct" and stated that "the statute should be liberally construed to protect . . . indebted rural water associations from municipal encroachment." *Id.*

Federal courts have identified three elements or requirements that a water utility must establish to invoke the protections of section 1926(b), which we conclude are consistent with the statute: (1) the utility is an "association" within the meaning of section 1926; (2) the utility has a qualifying federal loan outstanding; and (3) the utility "provided or made [service] available" to the disputed area. *Chesapeake Ranch Water Co. v. Bd. of Comm'rs*, 401 F.3d 274, 278 (4th Cir. 2005); *Le-Ax Water Dist. v. City of Athens*, 346 F.3d 701, 705 (6th Cir. 2003); *see also North Alamo Water Supply Corp.*, 90 F.3d at 915 (omitting the first element). Here there is no dispute that Creedmoor sufficiently pled the first two elements. Creedmoor alleged that it is a water supply corporation that has traditionally funded its capital improvements through loans under section 1926; that its assets, including its CCN "and all rights, duties, and privileges arising therefrom," are pledged in security for this debt; and that its current indebtedness to the Department of Agriculture, $1 million, will not be paid off until 2044 or 2046. However, the parties

18

join issue as to whether Creedmoor sufficiently pled facts demonstrating that it "provided or made [service] available" in the disputed area.

To meet its burden as to whether it "provided or made [service] available" in the disputed area, Creedmoor relies on the undisputed fact that its CCN encompassed the area before the TCEQ order. This is all it needed to do, Creedmoor reasons, because the existence of its legal duty under its CCN to provide service to the area, *see* Tex. Water Code Ann. § 13.250(a), singularly establishes, as a matter of law, that it "made [service] available" there. To support that proposition, Creedmoor relies on the Fifth Circuit's *North Alamo* decision.

*North Alamo* arose when the City of San Juan, Texas, began providing water service to five subdivisions that were within the certificated area of the North Alamo Water Supply Company and adjacent to North Alamo's existing lines. 90 F.3d at 913. North Alamo sued the City in federal court under section 1926(b) seeking to enjoin it from providing the service. Subsequently, the City filed applications with TCEQ's predecessor under water code section 13.254 seeking to decertify portions of North Alamo's service area and to recertify them in the City's name. *Id.* Before the agency reached a decision, the district court entered an agreed preliminary injunction enjoining the City from servicing any additional customers in North Alamo's certificated area and requiring it to request that the agency take no further action on its decertification petition. *Id.* at 914. The district court later entered final judgment in North Alamo's favor on two "alternative" grounds. First, the court held that North Alamo had, as a matter of law, "made service available" as required by section 1926(b) because it had the legal duty, as the CCN holder for the area, to provide continuous and adequate service to residents in its certificated area. *Id.*; *see* Tex. Water Code Ann. § 13.250(a). Second, the district court held that because North Alamo had water service lines

19

adjacent to the disputed areas, it had, as a factual matter, "made service available" as section 1926(b) required. *North Alamo*, 90 F.3d at 914. The City appealed. While the City's appeal was pending, the agency issued a cease-and-desist order requiring the City to cease providing service in the disputed area once North Alamo initiated service there. *Id.*

The Fifth Circuit affirmed the district court. It agreed with the district court that North Alamo's "state law duty [under its CCN] to provide service is the legal equivalent to the Utility's 'making service available' under § 1926(b)." *Id.* at 915-16. It also upheld the district court's "alternative" findings that North Alamo had "made service available" as a factual matter. *Id.* at 916. Specifically, the court noted "three findings of fact relevant to this conclusion: (1) the Utility currently provides water service to subdivisions adjacent to the disputed areas; (2) the Utility has lines and adequate facilities to provide service to the disputed areas; and (3) the Utility has not refused service to anyone who has requested service within the Certificated Area." *Id.* "[O]n the strength of these alternative legal and factual determinations," the Fifth Circuit affirmed the district court's legal conclusions that North Alamo had "'made services available'" to the disputed areas and that the City had violated section 1926(b). *Id.*

The City had also appealed the district court's injunction prohibiting it from pursuing its applications to decertify the disputed area from North Alamo's CCN and recertify the area to itself. The Fifth Circuit held that this issue was moot and did not reach its merits because the agency had ultimately entered its cease-and-desist order declaring that North Alamo had the exclusive right to provide water service to the disputed areas. *Id.* at 919-20; *see also id.* at 917 n.27 ("[A]n injunction, purporting to control the actions of the [agency], a state regulatory body, would create a considerably more difficult federalism question: Namely, does § 1926(b) also preclude a state

20

regulatory agency from modifying the service area of a federally indebted utility. But we leave that issue for another day.").

Creedmoor insists that *North Alamo* stands for the propositions that (1) it need only show that it "made service available" either as a legal or factual matter, and (2) the fact that its CCN encompassed the disputed area (at least before the TCEQ order) suffices to establish that it "made service available" as a legal matter. Carma questions Creedmoor's reading of *North Alamo*, urging that the court recognized that a water utility must establish that it "made service available" as both a legal *and* factual matter. As Carma points out, the *North Alamo* court cited, in support of its analysis of whether the utility "made service available" as a legal matter, a case from the Tenth Circuit, which holds that the utility is required to demonstrate that it has "adequate" facilities within or adjacent to the area to provide service to the area within a "reasonable time" after a request for service has been made. *Id.* at 916 (citing *Glenpool Util. Servs. Auth. v. Creek County Rural Water Dist. No. 2*, 861 F.2d 1211, 1214 (10th Cir. 1988)); *see Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1203 (10th Cir. 1999). In fact, as Carma observes, the other federal circuits that have considered what "provided or made [service] available" requires have uniformly held that it requires, in addition to a legal-right or duty-to-serve element, a "pipes in the ground" or "physical ability" element that requires the utility to show that it presently has the physical means to serve the area. *See Chesapeake Ranch Water Co.*, 401 F.3d at 279-81 (Fourth Circuit surveys other circuits' decisions and adopts three-part test from Sixth Circuit: (1) utility is "physically capable of serving the area"; (2) it has legal right to do so (which may be shown by proof of legal duty); and (3) disputed area is already within geographic boundaries of utility's franchise or certificated area); *Le-Ax Water Dist.*, 346 F.3d at 706-07 (Sixth Circuit reviews

21

decisions and adopts its three-element test); *Rural Water Sys. # 1 v. City of Sioux Center*, 202 F.3d 1035, 1037 (8th Cir. 2000) (requiring that utility demonstrate (1) physical capability to provide service to area, and (2) legal right under state law to serve area); *Sequoyah County Rural Water Dist. No. 7*, 191 F.3d at 1203 (utility must demonstrate "'that it has adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service [has been] made'" as well as legal right to serve).

To adopt Creedmoor's view, Carma urges, would mean that a "federally indebted utility could never be decertified, even if it admittedly could not provide service." Similarly, TCEQ argues that section 1926(b) is not implicated by its regulatory action releasing the disputed area from Creedmoor's CCN. *See* Tex. Water Code Ann. § 13.254(a-1)(3) (requiring petitioner to show that CCN holder "has refused to provide the service," "is not capable of providing the service on a continuous and adequate basis within the timeframe, at the level, or in the manner reasonably needed or requested by current and projected service demands in the area," or "conditions the provision of service on the payment of costs not properly allocable directly to the petitioner's service request, as determined by the commission"). TCEQ points out that the Fifth Circuit in *North Alamo* expressly left open the "difficult federalism question" of whether section 1926(b) preempted its predecessor agency from decertifying North Alamo under section 13.254(a). *North Alamo*, 90 F.3d at 917 n.27, 919-20.

"'The ultimate touchstone in every preemption case' is the intent and purpose of Congress as discerned primarily from the language of the statutory provision and the context of its enactment, and then through 'the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business,

22

consumers, and the law.'" *Worthy v. Collagen Corp.*, 967 S.W.2d 360, 367 (Tex. 1998) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996)). "We are also bound to follow the decisions of the United States Supreme Court, the final authority on federal preemption issues." *Id.* The U.S. Supreme Court has not yet spoken as to the meaning or scope of "provided or made [service] available" in section 1926(b), whether this provision embodies a legal or factual component or both, and what each component would require. For further guidance, we may look to the jurisprudence of the lower federal courts. Creedmoor suggests that we should ignore cases from outside the Fifth Circuit because "we are not in the 10th Circuit[,] we are in the Fifth Circuit[;] therefore[,] the holding of Fifth Circuit should control." To the contrary, the Texas Supreme Court has instructed us that while we "may certainly draw upon the precedents of the Fifth Circuit . . . in determining the applicable federal rule of decision, [we] are *obligated* to follow only higher Texas courts and the United States Supreme Court." *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (per curiam). And absent such binding authority, as *Penrod* indicates, we must independently determine the applicable federal rule of decision and may draw not only upon the Fifth Circuit but "any other federal or state court" to that end. *Id.* at 296.

Because section 1926(b) does not include an express definition of "provided or made [service] available," we look to the ordinary meaning of the terms. *Chesapeake Ranch Water Co.*, 401 F.3d at 280. "To 'provide' ordinarily means 'to make available,' to 'furnish,' to 'supply,' or to 'equip,'" while "[t]o 'make available' ordinarily means to 'render' 'suitable or ready for use.'" *Id.* (citing Webster's Encyclopedic Unabridged Dictionary of the English Language 142, 1161, 1556 (2001)). These ordinary meanings denote actual provision of service or physical capacity and readiness to provide service, not merely a legal right or duty to do so. This construction is

23

also consistent with the Congressional intent reflected in the statutory scheme and the context in which it was enacted. On its face, the protections in section 1926(b) reflect congressional recognition that the loans would finance actual construction of water and sewer projects in rural, often unincorporated areas, where the utility would otherwise be vulnerable to having its customers served by those projects (and revenue those projects would generate) annexed away by any encroaching municipalities. Similarly, the legislative history of section 1926(b) reflects that Congress intended for the statute "to assist in protecting the territory *served* by [an indebted] association facility against competitive facilities, which might otherwise be developed with the expansion of the boundaries of municipal and other public bodies into an area *served* by the rural system." S. Rep. No. 87-56, at 67 (1961), *as reprinted in* 1961 U.S.C.C.A.N. at 2309 (emphases added). The protection of section 1926(b) is thus "defensive" in nature, intended "to protect territory *already served* by a rural water association from municipal expansion into the rural water association's area." *Le-Ax Water Dist.*, 346 F.3d at 708 (emphasis added).

Consistent with the statute's text and context, federal appellate courts have overwhelmingly concluded that section 1926(b)'s "provided or made [service] available" element requires proof of both a legal right or duty to serve a particular area and a "pipes in the ground" or "physical ability" component that requires the utility to show that it is already providing service to the area or presently has the physical means to do so. *See Chesapeake Ranch Water Co.*, 401 F.3d 274, 279-81; *Le-Ax Water Dist.*, 346 F.3d at 706; *Rural Water Sys. # 1*, 202 F.3d at 1037; *Sequoyah County Rural Water Dist. No. 7*, 191 F.3d at 1203. While Creedmoor insists that *North Alamo* is to the contrary, we note that it was decided on very different facts, which involved the paradigmatic scenario to which section 1926(b) was plainly directed—a municipality annexing away areas that

24

a rural water utility is already serving as a matter of fact. Creedmoor points us to no case in which a court has held that section 1926(b) protects a utility that relies solely on bare possession of a legal right or duty to serve an area without regard to whether the utility has in fact served or is capable of serving the area.

We are persuaded by the majority view of the federal circuit courts—to establish that it "provided or made [service] available" to the disputed area, Creedmoor was required to plead (and ultimately prove) that it either presently was serving the area or at least presently had the physical means to do so. Creedmoor comes no closer to pleading facts meeting this requirement than a bald assertion that it "stands ready willing and able" to serve Carma's development "under the court's holdings in *North Alamo*" and "under the terms of its lawful tariff, the Texas Health and Safety Code, the Texas Water Code and TCEQ Chapters 290 and 291 rules." Elsewhere in its pleading, however, Creedmoor acknowledges that its tariff (which, the record reflects, it amended in response to Carma's service requests) required "developers" of over ten living-unit equivalents or 10 connections requiring meters with standard flow capacities of 10 g.p.m.—i.e., Carma—to provide their own "water right or long term lease sufficient to meet the minimum capacity demands . . . of the tract in question," "funding for the design, construction, and placing into commercial operation of all production, treatment, storage, pressure, operational and security facilities needed to secure the tract in question," "funding for the design, construction and placing into commercial operation of all distribution system facilities and infrastructure required on the tract in question," and "payment of all engineering, survey, legal, hydrological, recording and other fees needed to provide retail public utility service on the tract in question." While Creedmoor insists that "[a] tariff requirement requiring large developers to supply (in cash or in kind) a portion of the source of the

25

water to be distributed by a rural water company is not unusual," it remains that Creedmoor has not "provided or made [service] available" to Carma's development under any ordinary meaning of that phrase. *See Chesapeake Ranch Water Co.*, 401 F.3d at 279-81; *Le-Ax Water Dist.*, 346 F.3d at 706; *Rural Water System # 1*, 202 F.3d at 1037; *Sequoyah County Rural Water Dist. No. 7*, 191 F.3d at 1203; *see also Pittsburg County Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 719 (10th.Cir. 2004) (to extent that utility's rates are unreasonable, excessive, and confiscatory, it is not making water service "available" within meaning of section 1926(b)); *North Alamo Water Supply Corp.*, 90 F.3d at 916 (relying on findings that utility already provided water service to adjacent areas, had "lines and adequate facilities to provide service to the disputed areas," and utility "has not refused service to anyone who has requested" it). In short, Creedmoor's pleadings affirmatively refute, rather than support, any allegation that it "provided or made [service] available" to the disputed area as a factual matter.

Moreover, even if Creedmoor's pleadings had alleged facts demonstrating it had "provided or made [service] available" to the disputed area, these allegations would have been negated by uncontroverted evidence presented by TCEQ at the hearing on the pleas to the jurisdiction. TCEQ introduced a report of Creedmoor's engineer reflecting that the utility lacked both the infrastructure and water to serve Carma's development. Creedmoor did not present evidence to controvert these assertions, although it did present a report of its engineer opining as to the utility's lost revenues if the disputed area was released.[11]

---

[11] On appeal, Creedmoor attempts to present additional affidavit evidence that it considers relevant to its physical capacity to serve Carma in the future. Like summary-judgment evidence presented for the first time on appeal, we may not consider Creedmoor's additional jurisdictional evidence. *See Hendee I*, 228 S.W.3d at 376; *see also University of Tex. v. Morris*, 344 S.W.2d 426,

Because Creedmoor has not alleged facts demonstrating that it "provided or made [service] available" to the disputed area—and, in fact, Creedmoor's pleadings and the jurisdictional evidence negate that fact—Creedmoor cannot invoke the district court's inherent jurisdiction through its claims under the Supremacy Clause and 7 U.S.C.A. § 1926(b). Because that holding defeats jurisdiction, we do not reach whether the TCEQ's order is the sort of "curtailment" or "limitation" that section 1926(b) prohibits.

**Open Courts**

In addition to its Supremacy Clause claim, Creedmoor pleads that water code section 13.254(a-4)—the provision exempting expedited release petition proceedings from the APA and barring judicial review of TCEQ orders in those proceedings—violates the Texas Constitution's "Open Courts" guarantee:[12]

> **1.  Texas Water Code § 13.254(a-4) is in Violation of Texas Constitution art. 1 § 13 "Open Courts" Guarantee**
>
> 61.  The Texas Constitution guarantees that no Texas statute may deprive any person, including a corporate person, from due process of law through recourse to the courts anytime his 'land, goods, person or reputation' have been injured.
>
> 62.  The Texas Water Code § 13.254(a-4) provides that an order of the TCEQ issued under the authority of Water Code § 13.254(a-1) "is final after any reconsideration authorized by the commission's rules and may not be appealed."

---

429 (Tex. 1961) (general principle that appellate courts must consider only evidence that was before trial court at time of judgment).

[12] *See* Tex. Const. art. I, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.").

27

63.     A CCN constitutes a "good."

64.     Texas Water Code § 13.254(a-1) through (a-4) and 22 TAC Section 291.113(b), (d) and (e) is in direct violation of the "Open Courts" provisions of the Texas Constitution art. 1 § 13 because it denies Creedmoor the ability to appeal the TCEQ Approval Order granting [Carma's] Petition decertifying a portion of Creedmoor's CCN thereby depriving Creedmoor of its due process of law when its goods and reputation have been injured.

65.     Therefore [Creedmoor] submits that the portion(s) of Water Code § 13.254(a-4) and the TCEQ Rule found at 22 TAC Section 291.113 which excerpts expedited releases of utility service areas from the due process rights guaranteed in the Texas Administrative Procedures Act, Texas Gov't Code Chapter 2001 is unconstitutional and thereby a legal nullity and can be given no force and effect in light of the Open Courts guarantee of the Texas State constitution.

On appeal, Creedmoor characterizes these allegations as complaining of both section 13.254(a-4)'s prohibition against judicial review and its exemption of TCEQ proceedings on expedited release petitions from the APA's contested-case hearing requirement. Appellees urge that Creedmoor has not stated an Open Courts violation because it does not allege any deprivation of a "well-established common-law cause of action." *See Texas Ass'n of Bus.*, 852 S.W.2d at 448. We agree.

As we have previously observed, "there is no common-law cause of action for judicial review of an agency's administrative act." *City of Port Arthur v. Southwestern Bell Tel. Co.*, 13 S.W.3d 841, 845 (Tex. App.—Austin 2000, no pet.). Nor has the legislature abrogated any well-established common-law right of Creedmoor by its delegation of authority to TCEQ under water code subsections 13.254(a-1) through (a-4). Creedmoor argues that these procedures and limitations supplant a common-law trespass claim for deprivation of its rights under its CCN. However, such a claim would be "common law in name only" because Creedmoor's rights under its CCN are entirely a function of statute. *See Texas Mut. Ins. Co. v. Eckerd Corp.*, 162 S.W.3d 261, 266 (Tex.

28

App.—Austin 2005, pet. denied) (worker's compensation pharmacy reimbursement claims were "common law in name only" because such rights were based solely on statute and rules).  In fact, CCNs expressly do not confer property rights.  *See* 30 Tex. Admin. Code § 291.116 (2009)  (CCN "shall not be construed to vest exclusive service or property rights in and to the area certificated"); *Southwestern Bell*, 735 S.W.2d at 668 (rights under CCN "arise, and are held under and subject to" statutory and regulatory limitations).  Consequently, Creedmoor has failed to allege any Open Courts violation.[13]

**Due Process**

On appeal, Creedmoor maintains that it alleged "[t]he TCEQ Approval Order, the TWC Section 13.254(a)(1-4), and 30 TAC Section 291.113 violates Creedmoor's Constitutional Due Process Rights under the Fourteenth Amendment of the U.S. Constitution."[14]  In its briefing, Creedmoor urges that it had "a protectable property interest in its CCN," and that water code subsections 13.254(a-1) through (a-4) and their implementing rules render the CCN "useless and valueless, while blocking Creedmoor's legal recourse to the administrative and district courts by denying Creedmoor the right to a contested case proceeding or [] rights to an appeal."  Appellees urge that Creedmoor waived such a theory of inherent jurisdiction by failing to plead it in its petition. *See Continental Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 404-05 (Tex. 2000)

---

[13] Appellees further argue that even if Creedmoor had alleged a valid Open Courts claim as to subsection 13.254(a-4)'s prohibition against judicial review, the claim would be moot because it failed to timely perfect its claim for judicial review and later non-suited that claim.  We need not address that assertion.

[14] *See* U.S. Const. amend. XIV, § 1 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . .").

(plaintiff waived inherent jurisdiction argument by failing to raise it in trial court). And even if Creedmoor purported to plead a Fourteenth Amendment Due Process claim, appellees add, Creedmoor failed to allege facts that would demonstrate a violation. We agree with appellees.

To support its assertion that it pled a Fourteenth Amendment Due Process claim, Creedmoor points to a single allegation in its live petition that water code subsections 13.254(a-1) through (a-4) "violate[] Petitioner's rights to due process." However, bare conclusions, again, are not sufficient—the pleader must allege *facts* that affirmatively demonstrate the trial court's subject-matter jurisdiction. *See Miranda*, 133 S.W.3d at 226. The sole facts that Creedmoor alleges in regard to any "due process" issue are those it pleads in support of its Open Courts claim, quoted above. Creedmoor has not purported to allege any "due process" theory beyond its Open Courts claim. And, even if Creedmoor had purported to plead such a claim, the "property interest" it claims—its CCN—is not a vested property right entitled to due-process protection, as previously explained. 30 Tex. Admin. Code § 291.116; *Southwestern Bell Tel. Co.*, 735 S.W.2d at 668; *see also KEM Tex., Ltd.*, 2009 Tex. App. LEXIS 4894, at *18-20 (rights under easement to erect or maintain outdoor advertising were not "vested rights implicating due process" because such rights were statutorily contingent on state regulatory decisions to grant required licenses and permits). Creedmoor has not invoked the district court's inherent jurisdiction with any Fourteenth Amendment due-process claim.

## CONCLUSION

We conclude that Creedmoor has failed to affirmatively allege facts that invoke the district court's inherent jurisdiction to protect against ultra vires or unconstitutional agency

actions.[15]  Nor has Creedmoor suggested any way it could cure these jurisdictional defects through repleading, and we are not aware of any.  *See Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 839-40 (Tex. 2007).[16]  In fact, as noted, Creedmoor's pleadings and the jurisdictional evidence affirmatively negate the facts it would be required to plead to support its claim under the Supremacy Clause and 7 U.S.C. § 1926(b).  *Miranda*, 133 S.W.3d at 227 (if pleadings affirmatively negate existence of jurisdiction, then plea to the jurisdiction may be granted without allowing opportunity to amend).  Accordingly, we hold that the district court did not err in granting appellees' pleas to the jurisdiction, overrule Creedmoor's issue, and affirm the judgment.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed:   March 3, 2010

---

[15]  We thus need not address whether Creedmoor's complaints regarding TCEQ's rules can properly be asserted under the UDJA, as opposed to section 2001.038 of the Administrative Procedures Act.  *See* Tex. Gov't Code Ann. § 2001.038 (West 2008).

[16]  To the extent Creedmoor's allegations regarding TCEQ's rules could sound under section 2001.038, *see id.*, the justiciable controversy that could support such a claim was rendered moot by TCEQ's final, unappealable order. *See Friends of Canyon Lake v. Guadalupe-Blanco River Auth.*, 96 S.W.3d 519, 528-29 (Tex. App.—Austin 2002, pet. denied); *KEM Tex., Ltd.*, 2009 Tex. App. LEXIS 4894, at *20-21 n.6.