TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00297-CV






Appellants, Chester L. Slay, Jr., Individually; Union Texas Limited Partnership; and
Chester L. Slay, Jr., Trustee of Peckham Family Trust//Cross-Appellant, Texas Commission on Environmental Quality


v.


Appellee, Texas Commission on Environmental Quality// 

Cross-Appellees, Chester L. Slay, Jr., Individually; Union Texas Limited Partnership; and
Chester L. Slay, Jr., Trustee of Peckham Family Trust






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT

NO. D-1-GN-07-003823, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING





O P I N I O N



 These cross-appeals present two principal sets of issues: (1) whether a
Texas Commission on Environmental Quality (TCEQ) order imposing administrative penalties
withstands judicial review under the standard in section 2001.174 of the Administrative Procedure
Act (APA), see Tex. Gov't Code Ann. § 2001.174 (West 2008), and (2) whether the district court
possessed subject-matter jurisdiction over declaratory claims under section 2001.038 of the APA
that were asserted alongside the claimants' suit for judicial review, see id. § 2001.038 (West 2008). (1)
We conclude that the district court lacked subject-matter jurisdiction over the claims under
APA section 2001.038 and that there is no basis under APA section 2001.174 for reversing the
agency's order.


BACKGROUND

The Palmer Barge site

 The underlying dispute concerns a seventeen-acre tract located on the shores of
Sabine Lake in what has been described as an "industrial" area of Port Arthur. Between 1982 and
1997, the tract was the site of a barge and marine vessel servicing and maintenance business
operated by Palmer Barge Line, Inc. The business's primary operations included cleaning the
engines, boilers, and holds of vessels with steam or water. Palmer Barge eventually went into
bankruptcy and, in July 1997, ceased its servicing and maintenance operations. The following
September, the seventeen-acre property was conveyed in a non-judicial foreclosure sale to one of the
parties to these appeals, Union Texas Limited Partnership (Union Texas).

 Remaining on the Palmer Barge site, in the wake of the business's demise, were a
number of tanks and other structures containing substances that had been used or produced in the
business's operations. As early as 1997, the federal Environmental Protection Agency (EPA) and
TCEQ (2) had begun investigating the possible presence of hazardous wastes at several locations on
the property, including both the man-made structures and some places where substances had
ended up in the soil. As these investigations were continuing, on June 12, 1999, ownership of
Union Texas--again, the owner of the Palmer Barge site since September 1997--was conveyed in
its entirety to another party to these appeals, Chester L. Slay, Jr. (3) 

 Roughly two weeks thereafter, on June 24, 25, and 27, 1999, a TCEQ inspector,
Raymond Marlow, conducted a compliance inspection at the Palmer Barge site. Marlow returned
to the site on July 21. On that same day, Union Texas (again, now owned entirely by Slay) conveyed
the Palmer Barge site, in varying portions, to Slay in his capacity as trustee for four different
family trusts. (4) One of these trusts, the Peckham Family Trust, is a party to these appeals.


 On July 23, 1999, a sampling operation was performed for TCEQ at the Palmer Barge
site. The sampling detected benzene--a known carcinogen--in excess of 0.5 parts per million in
the waters stored in fourteen on-site tanks and one roll-off container. Additional site visits by
Marlow followed on August 4, October 20, and October 28, 1999. The October 20 visit was in
conjunction with an EPA site visit. During the following month, the EPA would have the wastes
removed from the tanks and containers at the site. The EPA would later designate the Palmer Barge
site as a "Superfund" site in July of the following year. (5) 


Fallout 

 In January 2000, TCEQ entered into an agreed order with a former owner of the
Palmer Barge business and property that recited eighteen sets of violations of state and federal
environmental regulations. These violations included allowing the discharge of contaminated storm
water, failing to complete hazardous waste determinations for wastes in various tanks and containers,
failing to label hazardous waste storage tanks and containers, failing to notify TCEQ of on-site waste
management units, and failing to obtain a permit for the storage of hazardous wastes for more than
ninety days. For all of these violations, the agreed order imposed a total penalty of $25,000.

 Later, in September 2002, the EPA also issued a consent order against
four responsible parties (none of whom is a party to this appeal) who had arranged for disposal or
treatment of hazardous substances at the Palmer Barge site or who had selected the facility as a
disposal site and transported hazardous substances to the facility. The responsible parties also agreed
to assess and remediate the site.

 Although the environmental problems at the Palmer Barge site predated their
ownership or involvement, and they had not themselves generated or contributed to the wastes
found there, (6) Union Texas, the Peckham Family Trust, and Slay were nonetheless targets of a
TCEQ enforcement action based on, in essence, their alleged inaction. (7) TCEQ issued a notice of
enforcement letter to Union Texas and the Peckham Family Trust on April 3, 2000. In June 2003,
TCEQ's executive director issued a preliminary report and petition alleging regulatory violations
not only by Union Texas and the Peckham Family Trust, as successive owners of the site, but also
by Slay individually, as an "operator" of the site. (8) The prosecution would ultimately proceed to
a contested-case hearing before an administrative law judge (ALJ) at the State Office of
Administrative Hearings. At the hearing, Slay appeared pro se both on his own behalf and as
representative of the two other respondents. Following the hearing, the ALJ determined that the
respondents had committed five sets of regulatory violations: 


(1) violating TCEQ rule 335.112(a)(9) and EPA rules 265.190-.202 by "failing
to properly label, inspect, assess, certify, or provide secondary containment
for 14 waste tanks"; (9)

 

(2) violating water code section 26.121(a) and TCEQ rule 335.8(b) by "failing
to conduct spill closure or remediation activities at 10 spill sites at the
Facility"; (10)


(3) violating TCEQ rule 335.62 and EPA rule 262.11 by "failing to perform
hazardous waste determinations and waste classifications on 15 different
wastes generated and stored in 15 different containers at the Facility"; (11)


(4) violating TCEQ rule 335.6(c) by "failing to notify TCEQ concerning the
storage of industrial waste at the Facility in the northwest slop oil tank, the
northeast slop oil tank, a container at the dock and a fresh water tank"; (12) and

(5) violating TCEQ rule 335.2 and EPA rule 270.1 by "failing to obtain a permit
to store, in 14 waste tanks at the Facility, hazardous waste generated on-site." (13)



TCEQ adopted these findings.

 Union Texas, the Peckham Family Trust, and Slay do not challenge these liability
findings on appeal. Their focus is instead on the monetary penalties that TCEQ imposed against
them for the violations.


Penalties

 Standards and criteria

 Where such violations are found, the Legislature has delegated discretion to TCEQ
to impose administrative penalties up to a maximum amount of $10,000 per day for each day
of violation. See Tex. Water Code Ann. § 7.051(c), (d) (West 2008). When TCEQ exercises this
discretion, however, the Legislature has directed that the agency "shall consider":


(1) the nature, circumstances, extent, duration, and gravity of the prohibited act,
with special emphasis on the impairment of existing water rights or the
hazard or potential hazard created to the health or safety of the public;


(2) the impact of the violation on:


 (A) air quality in the region;


 (B) a receiving stream or underground water reservoir;



 (C) instream uses, water quality, aquatic and wildlife habitat, or beneficial
freshwater inflows to bays and estuaries; or


 (D) affected persons;


(3) with respect to the alleged violator:


 (A) the history and extent of previous violations;


 (B) the degree of culpability, including whether the violation was
attributable to mechanical or electrical failures and whether the
violation could have been reasonably anticipated and avoided;


 (C) the demonstrated good faith, including actions taken by the alleged
violator to rectify the cause of the violation and to compensate
affected persons;


 (D) economic benefit gained through the violation; and 


 (E) the amount necessary to deter future violations; and


(4) any other matters that justice may require.



Id. § 7.053 (West 2008). At the center of this appeal is a September 2002 document, prepared by
TCEQ's enforcement division, that sets forth an elaborate methodology for applying these statutory
criteria. The document is titled, "Penalty Policy of the Texas Commission on Environmental
Quality" (hereinafter "Penalty Policy").

 The introduction to the Penalty Policy advises that the document's purpose is to
"describe the policy of [TCEQ] regarding the computation and assessment of administrative
penalties." It then explains: 


This document does not address when an enforcement action is initiated, but rather
how TCEQ staff are to evaluate violations for the purpose of recommending
administrative penalties to the commission.


This policy includes a description of how violations are evaluated in terms of harm
and severity and how any proposed penalties are determined. It includes a discussion
of what adjustments may be made to the base penalty amount after the review of
case-specific information and information concerning the respondent.



The document then sets forth a process for determining specific recommended penalty amounts that
consists of three basic steps or sets of steps: (1) determining a "base" penalty amount with respect
to each regulation found to have been violated; (2) determining the number of "violation events";
and (3) determining whether adjustments to the penalty are warranted based on specific
characteristics of the violator or the underlying conduct.

 In the first step, the base penalty amount is calculated by multiplying the
maximum penalty amount for violating the regulation at issue by a percentage derived from either
of two matrices. For violations that harm or have the potential to harm the environment or
human health, the matrix specifies a percentage that depends upon whether a release or discharge
is actual or merely potential; whether the extent of harm that would be caused by the release
is "major," "moderate," or "minor;" and whether the source is considered "major" or "minor." In
general, the applicable percentages are higher for actual as opposed to potential discharges, major
versus minor harm, and major versus minor sources. The other matrix applies to violations of
documentation or "programmatic" requirements and similarly prescribes ranges of percentages tied
to the perceived severity of the violation or consequences thereof, with generally higher percentages
imposed for greater severity.

 Once the base penalty is determined, the next step is to determine the number of
"violation events." According to the 2002 Penalty Policy, this is not simply a qualitative assessment,
but "depends on the number of times the violation is observed, the specific requirement violated,
the duration of the violation, and other case information." "Discrete events," those involving
"practices or actions that do not occur continuously," are assessed as "one penalty event . . . for
every documented observation of noncompliance." In contrast, "continuing" violations "are not
constrained by documented observations of noncompliance," and examples include "groundwater
contamination, unauthorized discharges/releases, . . . [and] operating without a required permit."
With continuing violations, the number of violations assessed depends in part on their harm or
severity, with "major" violations being "counted" as often as daily, "minor" violations counted as
often as quarterly, and "moderate" violations being counted as often as monthly. The beginning
date of the violation, the Policy further explains, may be "the initial date of noncompliance" and
will end when the respondent either "returned to compliance or the enforcement screening date,
whichever is appropriate."

 Once the number of violation events is determined, that number is multiplied by the
corresponding violation base penalty to yield a "violation base penalty." From there, amounts may
be added or subtracted from the subtotal based on several separate factors: (1) upward adjustment
for negative "compliance history"; (2) upward adjustment if the respondent is classified as a "repeat
violator"; (3) upward adjustment for "culpability," i.e., whether the respondent could have
anticipated and avoided the violation; (4) downward adjustment if the respondent made good-faith
efforts to return the site to compliance; (5) upward adjustment if the respondent obtained greater than
$15,000 in economic gain from its violation; and (6) downward adjustment if the respondent's
compliance history "performance" is "high" and upward if it is "poor" (and neither if it is "average"). 
Where the conditions for making any such adjustments are met, the adjustment amount is determined
by multiplying a specified percentage times the amount of the violation base penalty. After making
any such adjustments, the penalty is then subject to a further percentage adjustment based on
"other factors that justice may require," if any, to yield the final penalty amount. The final figure that
results is then compared to the statutory range of penalty amounts for violating the regulation and
adjusted as necessary to ensure that the penalty amount does not exceed the per-day maximum
penalty or fall below any statutorily specified minimum amount. 


 Application

 Based on an application of the Penalty Policy, TCEQ's executive director sought to
impose a total penalty of $596,625 on Union Texas, the Peckham Family Trust, and Slay, jointly and
severally. The executive director presented evidence detailing the underlying calculations, including
a series of completed "worksheets" or forms that the agency staff apparently uses for such purposes.
To summarize these calculations, the executive director ascertained that the applicable maximum
daily penalty for each of the five sets of regulatory violations was $10,000, and then determined the
violation base penalty for each as follows:



 For violating TCEQ rule 335.112(a)(9) and EPA rules 265.190-.202 ("failing
to properly label, inspect, assess, certify or provide secondary containment
for 14 waste tanks"), the executive director determined that the per-violation
base penalty was 50 percent of the daily maximum penalty, or $5,000. This
figure was then multiplied by ten, representing a determination that
the respondents should be charged with ten months of continuing violations
(roughly corresponding to the period between the June 1999 inspections
and April 2000). The product, $50,000, was then multiplied by four,
representing the executive director's determination that the monthly
violations had occurred in four separate areas of the Palmer Barge site. The
latter calculation yielded a violation base penalty of $200,000.
 For violating water code section 26.121(a) and TCEQ rule 335.8(b) ("failing
to conduct spill closure or remediation activities at 10 spill sites at the
Facility"), the executive director determined that the per-violation base
penalty was 50 percent of the daily maximum, or $5,000. This amount was
then multiplied by ten--again, apparently representing ten months of
continuing violations charged on a monthly basis--to yield a violation base
penalty of $50,000. 


 


 For violating TCEQ rule 335.62 and EPA rule 262.11 ("failing to perform
hazardous waste determinations and waste classifications on 15 different
wastes generated and stored in 15 different containers at the Facility"),
the executive director determined that the per-violation base penalty was
25 percent of the daily maximum, or $2,500. This figure was then multiplied
by fifteen (for fifteen locations where the violations occurred), yielding a
violation base penalty of $37,500. 


 


 For violating TCEQ rule 335.6(c) ("failing to notify TCEQ concerning
the storage of industrial waste at the Facility in the northwest slop oil tank,
the northeast slop oil tank, a container at the dock and a fresh water tank"),
the executive director determined that the per-violation base penalty was
25 percent of the daily maximum, or $2,500. This figure was then multiplied
by four (representing the four waste management units where the violations
occurred) to yield a violation base penalty of $10,000.


 


 For violating TCEQ rule 335.2 and EPA rule 270.1 ("failing to obtain a
permit to store, in 14 waste tanks at the Facility, hazardous waste generated
on-site"), the executive director determined that the per-violation base
penalty was 25 percent of the daily maximum, or $2,500. This figure was
then multiplied by ten (representing ten months of a continuing violation
charged on a monthly basis) to yield a violation base penalty of $25,000.




The total of these violation base penalties was $322,500. The executive director then enhanced this
amount by another thirty-five percent ($112,875). Twenty-five percent of this adjustment was based
on an adverse "compliance history" for the Palmer Barge site; the other ten percent was added for
the respondents' own purportedly "poor" compliance history. The executive director also added an
upward percentage adjustment of fifty percent of the total base penalty amount ($161,250) based on
what was determined to be $2.9 million in economic benefits that respondents obtained from
noncompliance. No other adjustments were made. Adding the two sets of enhancements to the total
of the violation base penalties brought the total penalty amount to the $596,625 figure that the
executive director sought. (14)

 The ALJ, in stark contrast, recommended that a total penalty of only $1,500 be
imposed against the respondents, jointly and severally. The ALJ found that the penalty calculation
worksheets underlying the executive director's recommended penalties "contain[ed] errors, unproven
assumptions, and unproven bases." Based on his own application of the Penalty Policy, the ALJ
concluded that each of the five regulatory violations was properly considered "only on a Facility-wide basis," thereby rejecting the executive director's use of multipliers where the same regulatory
violation was found to have occurred at more than one location within the site. The ALJ similarly
concluded that each regulatory violation should properly be considered a single violation event,
not ten events of continuing monthly violations, as the executive director had proposed with
respect to three of the violations. The ALJ further rejected the executive director's proposed upward
adjustments to the total violation base penalties. Instead, the ALJ concluded that, "[b]ased on the
facts and circumstances peculiar to this case," the only violations that should be penalized were
respondents' infringement of TCEQ rule 335.6(c), in the amount of $1,000, and TCEQ rule 335.2
and EPA rule 270.1, in the amount of $500, yielding the $1,500 total penalty.

 In the final penalty determination made by its commissioners, TCEQ modified the
ALJ's penalty recommendations as follows:


 TCEQ agreed that the executive director's penalty calculations had been flawed, but
modified the ALJ's finding of "errors, unproven assumptions, and unproven bases" to state
simply that the calculations had "inaccurately reflect[ed] the number of violation events for
continuing and programmatic violations." In its order, TCEQ explained that "although the
ED did have some inaccuracies in the penalty calculation worksheet, there were not unproven
assumptions and bases."

 TCEQ deleted the ALJ's conclusion that each of the five regulatory violations was properly
considered "only on a Facility-wide basis," explaining that "the Penalty Policy provides
for penalties for each discrete area of violation, and there were separate and discrete areas
at the site."

 TCEQ modified the ALJ's conclusions that each regulatory violation had been a single
violation event to reflect that, consistent with the executive director's recommendation,
three had been continuing monthly violation events. However, differing from the
executive director, the Commission determined that only five months of monthly penalties
should be imposed for each such violation, corresponding to the period between the
June 1999 site inspection to EPA's removal actions in November 1999.

 TCEQ then modified the ALJ's conclusions regarding penalty amounts to impose the
following penalties "based on the facts and circumstances peculiar to this case":





 For violating TCEQ rule 335.112(a)(9) and EPA rules 265.190-.202 ("failing to
properly label, inspect, assess, certify or provide secondary containment for 14 waste
tanks"), $100,000. This figure corresponds to the $200,000 violation base penalty
calculated by the executive director but with only five months of continuing monthly
violations charged rather than ten.


 

 

 For violating water code section 26.121(a) and TCEQ rule 335.8(b) ("failing to
conduct spill closure or remediation activities at 10 spill sites at the Facility"),
$25,000. This figure, like the preceding one, corresponds to the $50,000 violation
base penalty calculated by the executive director, but with only five months of
continuing monthly violations charged rather than ten.

 For violating TCEQ rule 335.62 and EPA rule 262.11 ("failing to perform hazardous
waste determinations and waste classifications on 15 different wastes generated and
stored in 15 different containers at the Facility"), $37,500. This amount is the same
as the violation base penalty recommended by the executive director.



 

 For violating TCEQ rule 335.6(c) ("failing to notify TCEQ concerning the storage
of industrial waste at the Facility in the northwest slop oil tank, the northeast
slop oil tank, a container at the dock and a fresh water tank"), $2,500. This figure
corresponds to the $10,000 violation base penalty calculated by the executive director
but without multiplying the per-violation base penalty ($2,500) by four to reflect the
number of areas implicated. 

 Finally, for violating TCEQ rule 335.2 and EPA rule 270.1 ("failing to obtain a
permit to store, in 14 waste tanks at the Facility, hazardous waste generated on-site"),
$12,500. This figure corresponds to the $25,000 violation base penalty calculated by
the executive director but with only five months of continuing monthly violations
charged rather than ten.




The total of these penalties was $177,500, which TCEQ imposed on the respondents jointly
and severally.

 Union Texas, the Peckham Family Trust, and Slay filed a motion for rehearing that
was overruled by operation of law.


Proceedings below

 After their motion for rehearing was overruled, Union Texas, the Peckham Family
Trust, and Slay (collectively, the Plaintiffs) filed suit against TCEQ and its executive director, in
his official capacity (collectively, the State Defendants). The Plaintiffs asserted two claims that are
predicated on statutory waivers of the State Defendants' sovereign immunity. (15) The first was a claim
seeking judicial review of TCEQ's order under subchapter G of the APA. See Tex. Gov't Code Ann.
§§ 2001.171-.178 (West 2008). (16) The second was a parallel claim under APA section 2001.038 for
a declaration invalidating what Plaintiffs alleged to be a TCEQ "rule"--the 2002 Penalty Policy--on
the basis that the agency had adopted it without complying with the APA's notice-and-comment
requirements. See id. § 2001.038(a); (17) see also Tex. Gov't Code Ann. §§ 2001.023-.033, .035
(West 2008) (notice-and-comment rule-making requirements); El Paso Hosp. Dist. v. Texas Health
& Human Servs. Comm'n, 247 S.W.3d 709, 715 (Tex. 2008) (invalidating agency "rule" for
noncompliance with these requirements).

 The State Defendants filed a plea to the jurisdiction contesting the district court's
subject-matter jurisdiction over the Plaintiffs' APA section 2001.038 claim. They relied on their
sovereign immunity from suit and the assertion that Plaintiffs had failed to invoke section 2001.038's
waiver of immunity for two reasons. First, the State Defendants argued that section 2001.038
authorizes suits solely for prospective declaratory relief before an agency rule is applied to a party,
and is unavailable where, as here, the rule has already been applied to a party in an agency
proceeding that has been concluded by a final order. Second, the State Defendants urged that the
2002 Penalty Policy was not a "rule" within the meaning of the APA, so as to be subject to challenge
via section 2001.038. Consequently, the State Defendants further reasoned, the Plaintiffs' sole
conceivable remedy with respect to their rule-invalidity complaint would have been through TCEQ's
contested-case hearing process and judicial review, subject to the exhaustion-of-remedies and error-preservation requirements applicable in that context. See Tex. Gov't Code Ann. §§ 2001.145, .171
(West 2008) (providing that failure to include complaint in motion for rehearing waives complaint
because motion for rehearing is judicial prerequisite to appeal); Public Utils. Comm'n of Tex.
v. Cities of Harlingen, 311 S.W.3d 610, 623 (Tex. App.--Austin 2010, no pet.) (citing Gonzalez
v. Texas Educ. Agency, 882 S.W.2d 526, 528 (Tex. App.--Austin 1994, no writ)). 

 The district court carried the plea through trial. Trial was to the bench, conducted
in what our record reflects was the manner contemplated by section 2001.175 of the APA, with
the evidence limited to the agency record. See Tex. Gov't Code Ann. § 2001.175. Following trial,
the district court rendered judgment denying the State Defendants' plea to the jurisdiction and
finding that "it has jurisdiction of Plaintiffs' declaratory judgment cause of action under [APA]
§ 2001.038." On the merits of that claim, however, the court rendered judgment "that the Penalty
Policy of TCEQ that went into effect September 1, 2002, is not a rule and TCEQ was not required to
comply with the rule making requirements set forth in APA §§ 2001.0225-.034 for the Penalty Policy
to be valid." Accordingly, the district court did not grant Plaintiffs relief on their section 2001.038
claim. As for the Plaintiffs' judicial-review claim, the district court rendered judgment that TCEQ's
final order "is supported by substantial evidence and should be affirmed in all respects." 

 The district court subsequently entered findings of fact and conclusions of law. Both
the Plaintiffs and the State Defendants filed notices of appeal.


ANALYSIS

 On appeal, the parties join issue with respect to the judgment's disposition of both
of Plaintiffs' claims.

Section 2001.038 claim

 In their second of three issues on appeal, Plaintiffs assert that the district court erred
in holding that the 2002 Penalty Policy was not a "rule" under the APA. While agreeing with the
court's holding that the Penalty Policy was not a "rule," the State Defendants urge that the
district court erred in purporting to reach that issue in the guise of deciding the merits of Plaintiffs'
section 2001.038 claim. In their second of two issues on appeal, the State Defendants argue that
the question of whether the Penalty Policy is a "rule" instead goes to the district court's subject-matter jurisdiction over the claim--specifically, whether Plaintiffs had stated a claim within
section 2001.038's waiver of sovereign immunity--such that the district court should have dismissed
the claim for want of jurisdiction upon concluding that the Policy was not a "rule." In their first
appellate issue, the State Defendants assert the broader contention that a section 2001.038 claim does
not lie where, as here, the challenged "rule" has already been applied as a basis for a final agency
order. In such instances, the State Defendants insist, a clamaint's sole remedy with respect to their
rule challenge would be judicial review (if the Legislature has provided it) from the final agency
order, subject to the principles that govern exhaustion of remedies and error preservation in that
context. Responding to these assertions in what they style as their first issue on appeal, Plaintiffs
argue, in part, that they properly invoked the district court's subject-matter jurisdiction under
section 2001.038.

 We will begin by addressing whether the district court possessed subject-matter jurisdiction over Plaintiffs' section 2001.038 claim. A plea to the jurisdiction challenges
a trial court's authority to decide the subject matter of a specific cause of action. See Texas Dep't
of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 225-26 (Tex. 2004). Analysis of whether this
authority exists begins with the plaintiff's live pleadings. Id. at 226. The plaintiff has the initial
burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause.
Id. (citing Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993)). Mere
unsupported legal conclusions do not suffice. See Creedmoor-Maha Water Supply Corp. v. Texas
Comm'n on Envtl. Quality, 307 S.W.3d 505, 515-16 & nn.7-8 (Tex. App.--Austin 2010, no pet.).
We must also consider evidence the parties presented below that is relevant to the jurisdictional
issues, Bland Independent School District v. Blue, 34 S.W.3d 547, 555 (Tex. 2000), including
evidence that a party has presented to negate the existence of facts alleged in the plaintiff's pleading.
See Miranda, 133 S.W.3d at 227; see also Combs v. Entertainment Publ'ns, Inc., 292 S.W.3d 712,
719 (Tex. App.--Austin 2009, no pet.) (summarizing different standards governing evidentiary
challenges to the existence of pleaded jurisdictional facts where such facts implicate both jurisdiction
and the merits versus where they implicate only jurisdiction). Our ultimate inquiry is whether the
plaintiff's pleaded and un-negated facts, taken as true and liberally construed with an eye to the
pleader's intent, would affirmatively demonstrate a claim or claims within the trial court's subject-matter jurisdiction. See Miranda, 133 S.W.3d at 226; Creedmoor-Maha, 307 S.W.3d at 513,
516 n.8. This is a question of law that we review de novo. See Miranda, 133 S.W.3d at 226;
Creedmoor-Maha, 307 S.W.3d at 513, 516 n.8.

 In APA section 2001.038, the Legislature has waived sovereign immunity to the
extent of creating a cause of action for declaratory relief regarding the "validity" or "applicability"
of a "rule," as defined under the Act, if "it is alleged that the rule or its threatened application
interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of
the plaintiff." Tex. Gov't Code Ann. § 2001.038(a); see Texas Logos, L.P. v. Texas Dep't of
Transp., 241 S.W.3d 105, 123 (Tex. App.--Austin 2007, no pet.) (holding that "section 2001.038
is a grant of original jurisdiction and, moreover, waives sovereign immunity"). From the face of the
statute, a challenged agency action that constitutes a "rule" is among the facts (more precisely, a
mixed question of law and fact) that must exist in order for a claimant to successfully invoke, via
section 2001.038, a trial court's subject-matter jurisdiction over the claim for relief authorized by
the statute. See, e.g., Combs v. City of Webster, 311 S.W.3d 85, 100-01 (Tex. App.--Austin 2009,
pet. denied) (recognizing that "[t]o the extent that no rule as defined by the APA is at issue,
section 2001.038 does not provide any basis for the district court's jurisdiction over appellees'
declaratory judgment action"). If there is no "rule as defined by the APA" being challenged, in other
words, the claimant cannot obtain the declaratory relief the statute authorizes against the State, its
agencies, or its agents, because sovereign immunity would bar the cause of action. See id.; see also
Texas Dep't of Transp. v. Sunset Transp., Inc., No. 03-10-00023-CV, 2011 WL 3659120, at *9-10
(Tex. App.--Austin Aug. 19, 2011, no pet. h.).

 In arguing otherwise, Plaintiffs seem to view such a holding as effectively insulating
all but formally promulgated rules from challenge under section 2001.038. As Plaintiffs observe,
such a holding would run counter to cases recognizing that informal agency statements can
be "rules" and be successfully challenged under APA section 2001.038. See, e.g., El Paso Hosp.
Dist., 247 S.W.3d at 714-15; Entertainment Publ'ns, Inc., 292 S.W.3d at 720-22; Texas Alcoholic
Beverage Comm'n v. Amusement & Music Operators of Tex., 997 S.W.2d 651, 657-58
(Tex. App.--Austin 1999, pet. dism'd w.o.j.). But such expressed concerns miss the point, which
is simply that whether or not the challenged agency action is a "rule" is one of the variables that
controls whether the trial court has subject-matter jurisdiction to entertain such a challenge by virtue
of section 2001.038. See City of Webster, 311 S.W.3d at 100-01.

 Relatedly, the Plaintiffs also seem to complain that treating the "rule" question as part
of the jurisdictional inquiry is improper because it overlaps or delves into the merits. They urge that
"the court would have to decide--before hearing Mr. Slay's appeal--that the Commission's Penalty
Policy was not a 'rule' under the APA, and, therefore, that its validity could not be challenged
through § 2001.038." As an initial matter, we question whether the "rule" issue overlaps the merits
of Plaintiffs' section 2001.038 claim, at least under the circumstances of this case. Whether or not
the 2002 Penalty Policy is a "rule" is distinct from and precedes the issue of whether Plaintiffs are
entitled to prevail on the merits of their claim for relief--a declaration that this "rule" is invalid
because it was not promulgated in accordance with the APA's notice-and-comment procedures.
See Tex. Gov't Code Ann. § 2001.038(a). In this respect, the "rule" issue is thus similar to the
antecedent question of whether a claimant has a "legal right or privilege" that can give rise to
standing to sue under section 2001.038. See id.; see also State v. BP Am. Prod. Co., 290 S.W.3d
345, 362-63 (Tex. App.--Austin 2009, pet. denied) (distinguishing this threshold standing question
from the merits of a section 2001.038 claim, and holding that section 2001.038's waiver does not
extend to antecedent determination of property rights on which standing would depend). But even
if the questions did overlap, Miranda and its progeny have made clear that this is no bar to courts
reaching the jurisdictional issue, see Miranda, 133 S.W.3d at 227; Creedmoor-Maha, 307 S.W.3d
at 516 n.8 (quoting Hendee v. Dewhurst, 228 S.W.3d 354, 368-69 (Tex. App.--Austin 2007,
pet. denied)); see also Miranda, 133 S.W.3d at 227 (further emphasizing that jurisdictional issues
should be resolved "as soon as practicable"), although the existence of such overlap may impact
the procedures courts use when examining jurisdictional evidence, as previously observed. See
Entertainment Publ'ns, Inc., 292 S.W.3d at 719.

 In sum, if the district court correctly determined that the 2002 Penalty Policy is not
a "rule" as defined in the APA, we agree with the State Defendants that the court would have erred
in purporting to assert jurisdiction over Plaintiffs' section 2001.038 claim. We turn to that question
now. A "rule" under the APA:


(A) means a state agency statement of general applicability that: 

 

 (i) implements, interprets, or prescribes law or policy; or 

 (ii) describes the procedure or practice requirements of a state agency;


(B) includes the amendment or repeal of a prior rule; and 


(C) does not include a statement regarding only the internal management or
organization of a state agency and not affecting private rights or procedures.



Tex. Gov't Code Ann. § 2001.003(6) (West 2008). We need only consider the implications
of subpart (C).

 Although the distinction between a "rule" and an agency statement that concerns only
"internal management or organization . . . and not affecting private rights" may sometimes be
elusive, (18) the core concept is that the agency statement must in itself have a binding effect on private
parties. See Texas Dep't of Safety v. Salazar, 304 S.W.3d 896, 905 (Tex. App.--Austin 2009,
no pet.) ("Agency statements that 'have no legal effect on private persons' are not considered rules.")
(quoting Brinkley v. Texas Lottery Comm'n, 986 S.W.2d 764, 770 (Tex. App.--Austin 1999,
no pet.)); Entertainment Publ'ns, Inc., 292 S.W.3d at 722 (emphasizing that legal interpretation in
Comptroller's letters would bind agency employees and "unambiguously express[ed] an intent to
apply this interpretation . . . in all future cases" involving similar facts); see also Amusement &
Music Operators of Tex., 997 S.W.2d at 658 (where there was evidence that agents "not only intend
to enforce, but have enforced administrative sanctions" in accordance with agency's memoranda,
trial court did not abuse its discretion in granting temporary injunction predicated on findings and
conclusions that memoranda were "rules" under APA).

 Regarding this criterion, Plaintiffs alleged in their petition that the Penalty Policy
"has a binding effect on Plaintiffs who are private parties" and that the Policy "determines the
amount of the penalty assessed against that entity and/or defendant." There was also evidence before
the district court--including the text of the Policy itself--that TCEQ staff was required to follow
the Penalty Policy's methodology in determining penalty recommendations. And the executive
director purported to do just that, as we have previously detailed. Moreover, the penalties ultimately
imposed by the TCEQ commissioners were in amounts consistent with the violation base penalties
the executive director had recommended, adjusted for differences in the multipliers used (i.e.,
"counting" five rather than ten months of continuing monthly violations and one rather than four
violations of TCEQ rule 335.6(c)). But what ultimately matters is that the district court also had
evidence to the effect that the TCEQ commissioners were not bound to follow the Penalty Policy's
methodology when exercising their legislatively conferred discretion to impose penalties. 

 The introductory section of the Penalty Policy states that the Policy's purpose is to
explain "how TCEQ staff are to evaluate violations for the purpose of recommending administrative
penalties to the commission." (Emphasis added.) The nature of the Penalty Policy is further
illuminated by the following TCEQ rule:


The executive director may use enforcement guidelines that are neither rules nor
precedents, but rather announce the manner in which the agency expects to exercise
its discretion in future proceedings. These guidelines do not establish rules which
the public is required to obey or with which it is to avoid conflict. These guidelines
do not convey any rights or impose any obligations on members of the public. These
guidelines are available to the public under the terms of the Public Information Act,
Texas Government Code, Chapter 552.



30 Tex. Admin. Code § 70.3 (2011) (Texas Comm'n on Envtl. Quality, Enforcement Guidelines).
The Penalty Policy would appear to be an "enforcement guideline" within the meaning of this rule. 

 Relying on such authorities and evidence, the district court made the following
findings of fact (also styled in the alternative as conclusions of law) relevant to the nature and effect
of the Penalty Policy:


3. In the contested case proceeding before the TCEQ, held at the State Office of
Administrative Hearings, the Executive Director used the TCEQ Penalty
Policy to calculate the amount of administrative penalties to request.


4. The final assessment of administrative penalties against [Plaintiffs] was based
on the decision of the three TCEQ Commissioners.


. . . .


9. The TCEQ Penalty Policy is an agency statement regarding the internal
management of the TCEQ.


. . . .


12. The TCEQ Penalty Policy does not affect private rights.



13. The TCEQ Penalty Policy addresses how TCEQ staff are to evaluate
violations for the purpose of recommending administrative penalties to the
Commissioners.


14. The TCEQ Penalty Policy was designed by the TCEQ's enforcement division
to promote the consistent calculation of administrative penalties by ensuring
that administrative penalties requested by the Executive Director staff are
calculated in a uniform way.


15. The TCEQ Penalty Policy allows the TCEQ to function effectively by
producing clarity in the assessment of administrative penalties through the
promotion of internal consistency in the application of the administrative
penalty statutes.


16. TCEQ's Rule 70.3 provides:


 The executive director may use enforcement guidelines that are neither rules
nor precedents, but rather announce the manner in which the agency expects
to exercise its discretion in future proceedings. These guidelines do not
establish rules which the public is required to obey or with which it is to
avoid conflict. These guidelines do not convey any rights or impose any
obligations on members of the public. These guidelines are available to the
public under the terms of the Public Information Act, Texas Government
Code, Chapter 552. See 30 Tex. Admin. Code § 70.3.


17. A preponderance of the evidence showed that the TCEQ Penalty Policy is not
a rule.



The evidence reasonably supports these findings. The findings are also proper procedurally.
Although the district court made these findings regarding the "rule" question in the evident belief
that the issue went to the merits of Plaintiffs' section 2001.038 claim, the findings are also proper
and controlling in determining the jurisdictional issue. See Entertainment Publ'ns, Inc., 292 S.W.3d
at 719; see also Miranda, 133 S.W.3d at 227-28 (noting that jurisdictional issue may be resolved
after trial); Director of the Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex., 600 S.W.2d 264
(Tex. 1980) (deciding jurisdictional issue following trial).

 Plaintiffs suggest that it suffices that the TCEQ commissioners imposed penalties
that were largely consistent with the recommendations that the executive director derived from the
Penalty Policy. They insist that this decision amounts to "enforcement" of the Penalty Policy so as
to impact their private rights. See Brinkley, 986 S.W.2d at 770 ("[The] statutory exclusion [for
statement regarding internal management or organization of a state agency and not affecting private
rights or procedures] encompasses any agency statement regarding 'law,' 'policy,' or procedural
'requirements' made outside the rulemaking and contested-case context: such statements have no
legal effect on persons absent . . . some attempt by the agency to enforce its statement against a
private person . . . . At that point, an affected person may challenge, if he wishes, the validity or
applicability of the agency statement on whatever grounds may be applicable."). We conclude that
the record supports the distinction the district court drew between internal agency matters governed
by the Penalty Policy and the TCEQ commissioners' ultimate exercise of their statutory discretion.

 Concluding that the district court did not err in determining that the 2002 Penalty
Policy was not a "rule" as defined in the APA but erred in purporting to exercise subject-matter
jurisdiction over Plaintiffs' section 2001.038 claims, we sustain the State Defendants' second issue
and overrule Plaintiffs' second issue and, in pertinent part, their first issue. We need not reach the
State Defendants' first issue. See Tex. R. App. P. 47.1.


Judicial-review claim

 We now turn to the appellate issues challenging the portion of the district court's
judgment addressing Plaintiffs' judicial-review claim, all of which were raised by Plaintiffs. Within
their first issue, Plaintiffs argue that even if their section 2001.038 claim is jurisdictionally barred,
they had invoked the district court's jurisdiction to address that complaint via their judicial-review
claim and were entitled to relief. We need go no further than to observe that our disposition of
Plaintiffs' second issue forecloses this argument. Consequently, we overrule this portion of
Plaintiffs' first issue.

 In their third issue, Plaintiffs challenge TCEQ's order assessing administrative
penalties against them. Specifically, Plaintiffs argue that (1) the penalties assessed for unauthorized
storage of solid wastes and hazardous wastes are not supported by evidence that the stored materials
were, in fact, "waste"; (2) TCEQ's use of the 2002 Penalty Policy to assess fines for violations
occurring in 1999 is an unlawful, retroactive application of the law; and (3) TCEQ improperly
amended the ALJ's conclusions and proposal for decision.


 Standard of review

 The parties agree that our review of TCEQ's order is governed by
APA section 2001.174. This standard requires that we reverse or remand a case for further
proceedings "if substantial rights of the appellant have been prejudiced because the administrative
findings, inferences, conclusions, or decisions" are

 

 (A) in violation of a constitutional or statutory provision;

 

 (B) in excess of the agency's statutory authority;


 (C) made through unlawful procedure;

 

 (D) affected by other error of law;

 

 (E) not reasonably supported by substantial evidence considering the reliable and
probative evidence in the record as a whole; or

 (F) arbitrary or capricious or characterized by abuse of discretion
or clearly unwarranted exercise of discretion.



Tex. Gov't Code Ann. § 2001.174(2). However, we may not substitute our judgment for that
of the agency's on the weight of the evidence on matters committed to agency discretion.
Southwestern Pub. Serv. Co. v. Public Util. Comm'n of Tex., 962 S.W.2d 207, 215
(Tex. App.--Austin 1998, pet. denied). With respect to subparagraph (E), "substantial evidence"
does not mean a large or considerable amount of evidence, but such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion of fact. Pierce v. Underwood,
487 U.S. 552, 564-65 (1988); Lauderdale v. Texas Dep't of Agric., 923 S.W.2d 834, 836
(Tex. App.--Austin 1996, no writ). The test is not whether the agency made the correct conclusion
in our view, but whether some reasonable basis exists in the record for the agency's action. Railroad
Comm'n of Tex. v. Pend Oreille Oil & Gas Co., Inc., 817 S.W.2d 36, 41 (Tex. 1991). We must
uphold an agency's finding even if the evidence actually preponderates against it, so long as
enough evidence suggests the agency's determination was within the bounds of reasonableness.
Southwestern Pub. Serv. Co., 962 S.W.2d at 215.

 

 Waste

 Plaintiffs, referencing the penalties assessed against them for violations arising
from unauthorized storage of solid and hazardous wastes, argue that there is no evidence in the
record that TCEQ determined that the stored materials were, in fact, "solid waste" or "hazardous
waste" as those term are defined by the relevant regulations. See 30 Tex. Admin. Code 101.1(42)
(defining "hazardous waste"), (93) (defining "solid waste") (West 2011) (Texas Comm'n on Envtl.
Quality, Definitions). We disagree.

 TCEQ investigator Marlow testified that during his investigation of the Palmer Barge
site in June and July of 1999, he saw "waste" in containers that smelled of hydrocarbons and, in his
experience, materials with that odor had "hazardous characteristics." Based on his observations,
he requested testing and analysis of the materials by an outside contractor for TCEQ. He further
testified that those tests showed significant levels of benzene in the samples taken from the site and
that benzene is a hazardous waste.

 In addition to Marlow's testimony, the record contains other evidence supporting
TCEQ's determination that there was waste at the site. Most significantly, Plaintiffs stipulated to
the information contained in the inspection report Marlow referenced in his testimony. That report,
which was included as an exhibit to the administrative hearing, includes the following relevant
information: 

 

 [T]en soil samples were taken during th[e screening site inspection] in question in
this action . . . . [T]hose ten soil samples were analyzed and . . . the analyzing
procedure was accurate and credible . . . . [T]hose ten soils samples showed
detectable limits of either or both industrial and hazardous waste . . . . [T]hose ten
soil samples were taken on the property known as Palmer Barge site . . . .



This report also includes a list of "hazardous substances," including benzene, found in detectable
quantities at the Palmer Barge site. Finally, TCEQ introduced into evidence the agreed order
between it and John Palmer from January 2000. In that order, TCEQ and Palmer agree that the
Palmer Barge site contained waste materials, including waste oils, diesel fuel, and liquid waste.

 Based on this evidence, there is a reasonable basis in the record for the agency's
determination. See Pend Oreille, 817 S.W.2d at 41. As TCEQ's determination that the materials
were waste is within the bounds of reasonableness, we are required to uphold that decision. See
Southwestern Pub. Serv. Co., 962 S.W.2d at 215.


 Retroactive application of the law 

 Plaintiffs argue that TCEQ's use of the 2002 Penalty Policy to assess fines for
violations occurring in 1999 was an unlawful, retroactive application of the law. See Tex. Const.
art. I, § 16 ("No bill of attainder, ex post facto law, retroactive law, or any law impairing the
obligation of contracts, shall be made."). This assertion, however, presumes that the Penalty Policy
has a legal effect on the Plaintiffs. As we have previously explained, however, the Penalty Policy
has no such effect because it does not control the TCEQ commissioners' ultimate exercise of their
statutory discretion to impose penalties.


 Amendment of ALJ's proposal for decision

 In their final challenge to TCEQ's order, Plaintiffs assert that TCEQ improperly
overturned the ALJ's conclusions and proposal for decision by "arbitrarily alter[ing] one finding of
fact and twelve conclusions of law." Specifically, Plaintiffs argue that TCEQ's modifications to one
finding and twelve conclusions--all of which involve, in some aspect, TCEQ's calculations or the
penalties assess against Plaintffs--were not "authoriz[ed] by law or policy" or supported by the
evidence in the record. We disagree.

 Section 2003.047(m) of the government code allows TCEQ to amend the ALJ's
proposal for decision, including any findings of fact, as long as the amendment is "based solely on
the record" and is "accompanied by an explanation of the basis of the amendment." See Tex. Gov't
Code Ann. § 2003.047(m) (West 2008). We have interpreted that section to require that any changes
to the ALJ's proposed findings and conclusions be reviewed under APA section 2001.174--i.e., we
review legal conclusions for error of law and factual findings for support by substantial evidence.
See CenterPoint Energy Entex v. Railroad Comm'n of Tex., 213 S.W.3d 364, 369
(Tex. App.--Austin 2006, no pet.); Heat Energy Advanced Tech., Inc. v. West Dallas Coal. For
Envtl. Justice, 962 S.W.3d 288, 295-96 (Tex. App.--Austin 1998, pet. denied) (citing Southwestern
Pub. Serv. Co., 962 S.W.2d at 214-16).

 TCEQ modified the ALJ's finding of fact that "[a]ll of the penalty calculation
worksheets (PCWs) prepared by [TCEQ] to support its proposed administrative penalties contain
errors, unproven assumptions and unproven bases" to state instead that "[t]he penalty calculation
worksheet (PCW) prepared by the Executive Director to support [its] propose[d] administrative
penalties inaccurately reflects the number of violation events for continuing violations
and programmatic violations." As the basis for its change, TCEQ explained that "although the
[Executive Director] did have some inaccuracies in the penalty calculation worksheet, there were not
unproven assumption and bases." Plaintiffs argue that this change was arbitrary, but the record
contains both testimonial and documentary evidence reflecting the number of violation events that
occurred on the site at issue here and their duration. Given this support in the evidence and TCEQ's
inclusion of an explanation for the change, we cannot conclude that TCEQ's actions here were
arbitrary and capricious. Further, we note that TCEQ is not required to make findings on matters
that it did not rely on for support of its ultimate determinations. See City of Dallas v. Railroad
Comm'n of Tex., No. 03-06-00580-CV, 2008 WL 4823225, at * 8 (Tex. App.--Austin 2008, no pet.)
(citing State Banking Bd. v. Valley Nat'l Bank, 604 S.W.2d 415, 419 (Tex. Civ. App.--Austin 1980,
writ ref'd n.r.e.)).

 Plaintiffs also complain of TCEQ's deletion of the ALJ's conclusion that "[e]ach
violation is considered only on a Facility-wide basis." Specifically, Plaintiffs assert that TCEQ's
omission and explanation for the omission--i.e., that the "Penalty Policy provides for each discrete
area of violation, and there were separate and discrete areas at the cite"--is not supported by
language of the Penalty Policy. We disagree. The Penalty Policy provides that "[t]he number of
violation events that will be assessed a penalty depends on the number of times the violation is
observed, the specific requirement violated, the duration of the violation, and other case
information." (Emphasis added.) Further, the record contains evidence supporting TCEQ's
conclusion that the Palmer Barge site should be treated as four separate areas, including Slay's
testimony regarding the existence of four separate tracts owned by four separate entities. Regardless,
given TCEQ's broad discretion in interpreting its own internal guidelines, the broad language of the
Penalty Policy regarding determination of violations, and the evidentiary support for the omission,
we cannot say that TCEQ's deletion here was arbitrary.

 In a related argument, Plaintiffs complain of TCEQ's modifications to five of
the ALJ's conclusions of law regarding the number and duration of violation events for which
Plantiffs were cited. Four of these modifications involved changing conclusions from "[t]he
collective violation by [Plaintiffs] constitutes one violation event" to "[t]he collective violation by
[Plaintiffs] constitutes," depending on the alleged violation, either "5 monthly events" or "fifteen
violation events." These changes were made, according to TCEQ, "to reflect monthly penalties for
violations during the five months from the site inspection to EPA's removal action, rather than a
single violation." The remaining modification changed the ALJ's conclusion that "PCWs prepared
by [TCEQ] do not support the administrative penalties proposed by [TCEQ]" to the "PCW prepared
by [TCEQ] inaccurately reflect the number of violation events for continuing violations and
programmatic violations." This conclusion was changed, TCEQ explained, "to reflect that [TCEQ]
inaccurately calculated the number of months for which penalties should be assessed because the
waste was removed by EPA five months after the inspection, and [TCEQ] had calculated ten months
from the inspection to the screening."

 Plaintiffs argue that neither the Penalty Policy nor the evidence supports these
modifications. We note, however, that in addition to the evidence discussed above regarding
treatment of the site as four separate areas, the record contains evidence that the violations occurred
over a five-month period of time. Further, as discussed previously, the Penalty Policy's language
regarding these calculations is quite broad. Given the supporting evidence, the inclusion of an
explanation for each change, and the broad language of the Penalty Policy, we cannot say that
TCEQ's amendments to the ALJ's conclusions were arbitrary.

 We overrule Plaintiffs' third issue.


CONCLUSION

 In light of the foregoing analysis, we reverse the portion of the district court's
judgment denying the State Defendants' plea to the jurisdiction and holding that it has subject-matter
jurisdiction over Plaintiffs' APA section 2001.038 claim. We render judgment dismissing Plaintiffs'
APA section 2001.038 claim for want of subject-matter jurisdiction. We otherwise affirm the
district court's judgment.



 __________________________________________

 Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Goodwin

Affirmed in part; Reversed and Dismissed in part

Filed: August 31, 2011
1. The APA is codified in title 10, subtitle A, chapter 2001 of the Texas Government Code.
See Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2008).
2. This event and some others we recount actually involved TCEQ's predecessor agencies.
For clarity, and because any distinctions are immaterial to our analysis, we will use "TCEQ" as
shorthand for Texas's state environmental regulatory agencies in both their current and prior
incarnations.
3. To be precise, Slay was conveyed one-hundred percent of the stock in Union Capital
Recovery Corporation (Union Capital). Union Capital, in turn, owned a ninety-nine percent share
of the Union Texas limited partnership. Union Capital also held the remaining one percent of
Union Texas indirectly through owning one-hundred percent of the stock of Nuggetman Corporation,
which held the one-percent share of Union Texas as general partner. Thus, as of June 12, 1999, Slay
was the indirect sole owner of the entirety of the Union Texas limited partnership that owned the
Palmer Barge site.


 Slay, who had been involved with a similar barge-servicing business on an adjacent
property, would later testify that he had agreed to the conveyance to resolve a boundary dispute with
former owners of the Palmer Barge site. He explained his willingness to enter into such a transaction
despite the risks by claiming that he had been under treatment for non-Hodgkins' lymphoma (a form
of cancer) at the time--an illness he attributed to benzene to which he had been exposed in his
barge-servicing work--and that the illness and treatment had impaired both his physical strength
and judgment. He also professed a belief that the site's owners had taken unfair advantage of him
in luring him into taking the deal. However, the administrative law judge (ALJ) would make no
findings to this effect, but would instead cite evidence that Slay was a sophisticated real estate
investor who was familiar with both the Palmer Barge site and the environmental issues potentially
associated with barge-cleaning businesses, having been assessed civil penalties by TCEQ for
violations of environmental regulations by his own business during the 1980s. The ALJ would also
find that Slay had planned to lease the Palmer Barge site to a third party that would use it for
reconstruction of offshore oil platforms. 
4. The ALJ would later observe that interests related to Slay's own barge-servicing business
had similarly been held in family trusts. 
5. A Superfund site is a place considered a national priority for environmental remediation
because of known or threatened releases of hazardous substances at that site. See 42 U.S.C.A.
§§ 9601-9626 (West 1991) (Comprehensive Environmental Response, Compensation and Liability
Act, commonly known as the Superfund law).
6. TCEQ would later adopt the following ALJ findings concerning the responsibility of these
three parties for the presence of the wastes found at the Palmer Barge site:



 "None of Respondents engaged in any active operations at the Facility."


 


 "Respondents did not build or actively operate any tanks, containers or other
structures at the Facility."


 


 "All of the waste stored in the various tanks and containers were generated and
stored by Palmer prior to his cessation of operations in 1997."


 


 "Respondents did not store any wastes other than those previously placed into the
tanks and containers by Palmer."


 


 "The wastes that are the subject of this enforcement action against Respondents
were stored between 1997 and June 12, 1999 [the date when Slay acquired
Union Texas], by entities who are not respondents."


 


 "The stained soils identified by the Executive Director were present at the
Facility in November 1997 [when Union Texas acquired ownership]."


 


 "The wastes in the tanks and containers identified by the Executive Director were
present at the Facility in November 1997."
7. TCEQ initially pursued three of the four family trusts that now owned the Palmer Barge
site, but later dismissed all but the Peckham Family Trust.
8. See 30 Tex. Admin. Code § 335.1(103) (2011) (Texas Comm'n on Envtl. Quality,
Definitions).
9. See id. § 335.112(a)(9) (2011) (Texas Comm'n on Envtl. Quality, Standards); 40 CFR
§§ 265.190-.220 (2011).
10. See Tex. Water Code Ann. § 26.121(a) (West 2008); 30 Tex. Admin. Code § 335.8(b)
(2011) (Texas Comm'n on Envtl. Quality, Closure and Remediation).
11. See 30 Tex. Admin. Code § 335.62 (2011) (Texas Comm'n on Envtl. Quality, Hazardous
Waste Determination and Waste Classification); 40 C.F.R. § 262.11 (2011).
12. See 30 Tex. Admin. Code § 335.6(c) (2011) (Texas Comm'n on Envtl. Quality,
Notification Requirements).
13. See id. § 335.2 (2011) (Texas Comm'n on Envtl. Quality, Permit Required); 40 C.F.R.
§ 270.1 (2011).
14. The executive director also presented evidence of an alternative set of calculations to
support imposition of separate penalties in the amounts of $212,750 against the Peckham Family
Trust, $471,750 against Union Texas, and $596,625 (the same amount as the proposed joint-and-several penalty) against Slay individually.
15. See, e.g., Texas Natural Res. Conservation Comm'n v. IT-Davy, 74 S.W.3d 849, 853-54
(Tex. 2002) (holding that sovereign immunity generally bars suits against the state, its agencies, or
officials in official capacity).
16. See Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc., 145 S.W.3d
170, 198 (Tex. 2004) (observing that APA waives sovereign immunity to permit judicial-review
claims against agencies); see also Continental Cas. Ins. Co. v. Functional Restoration Assocs.,
19 S.W.3d 393, 397 (Tex. 2000) ("It is well recognized under Texas law that there is no right to
judicial review of an administrative order unless a statute provides a right or unless the order
adversely affects a vested property right or otherwise violates a constitutional right.") (citing Stone
v. Texas Liquor Control Bd., 417 S.W.2d 385, 385-86 (Tex. 1967)). 
17. See also Texas Logos, L.P. v. Texas Dep't of Transp., 241 S.W.3d 105, 123
(Tex. App.--Austin 2007, no pet.) (holding that "section 2001.038 is a grant of original jurisdiction
and, moreover, waives sovereign immunity").
18. See, e.g., Ron Beal, Substantive and Interpretive Rules: The Judiciary Continues to
Struggle to Define Them and to Determine Their Legal Validity and Effect, 12 Tex. Tech Admin.
L.J. 55, 59-72 (2010) (summarizing some of this Court's more recent struggles with the distinction).